Stephen M. SILVERMAN,
Plaintiff–Appellant,

v.

CBS INC., Defendant–Appellee.

No. 1175, Docket 88–7165.

United States Court of Appeals,
Second Circuit.

Argued May 25, 1988.

Decided Feb. 6, 1989.

**42**

Barry I. Fredericks, New York City (Aurnou & Fredericks, New York City, on the brief), for plaintiff–appellant.

David Rabinowitz, New York City (Stanley Rothenberg, Moses & Singer, New York City, on the brief), for defendant-appellee.

Before FEINBERG, NEWMAN and PRATT, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal presents somewhat novel issues of both copyright and trademark law arising from the efforts of appellant Stephen M. Silverman to develop a musical based on the "Amos 'n' Andy" characters.[1] The attempt to transport Amos, Andy, Kingfish, Algonquin J. Calhoun, and all the others from the well-known radio and television shows of earlier decades to Broadway (possibly in a cab of the Fresh Air Taxi Co.) has thus far been stymied by the assertion of copyright and trademark infringement claims by appellee CBS Inc. Silverman appeals from a judgment of the District Court for the Southern District of New York (Gerard L. Goettel, Judge) awarding CBS damages, declaratory relief, and an injunction. Because some "Amos

'n' Andy" materials are in the public domain while others remain subject to CBS copyrights, and because CBS has elected not to make commercial use of its "Amos 'n' Andy" radio and television programs, nor create new ones, since 1966, the issues primarily raised on this appeal are the extent of copyright protection available to CBS with respect to the "Amos 'n' Andy" characters and whether CBS has abandoned through non-use whatever trademarks it might have. We conclude that to a limited extent copyright infringement has occurred, that the declaratory and injunctive relief awarded CBS should be modified to avoid extension of copyright protection to public domain materials, that Silverman is entitled to limited declaratory relief, and that CBS's trademarks, if valid, have been abandoned.

### Facts

The "Amos 'n' Andy" characters were created in 1928 by Freeman F. Gosden and Charles J. Correll, who wrote and produced for radio broadcasting "The Amos 'n' Andy Show." The show became one of the country's most popular radio programs. The characters in the Amos 'n' Andy programs were Black. Gosden and Correll, who were White, portrayed Amos and Andy on radio. The authors appeared in blackface in publicity photos. Black actors played the parts in the subsequent television programs.

Gosden and Correll assigned all of their rights in the "Amos 'n' Andy Show" scripts and radio programs to CBS Inc. in 1948. Gosden and Correll continued to create new "Amos 'n' Andy" scripts, which formed the basis for CBS radio programs. The radio programs continued until 1955. Beginning in 1951 CBS also broadcast an "Amos 'n' Andy" television series. The television series was aired on CBS affiliate stations until 1953 and continued in reruns and non-network syndication until 1966. CBS has not aired or licensed for airing any of the radio or television programs since 1966.

---

1. In this litigation, the phrase has been variously spelled "Amos 'n' Andy," "Amos 'N' Andy," and "Amos 'n Andy." For convenience, we will spell it "Amos 'n' Andy" except when referring to it as a trademark, where it will appear as AMOS 'N' ANDY.

In 1981, Silverman began writing a script for a Broadway musical based on the "Amos 'n' Andy" characters. The title of this work was originally "Amos 'n' Andy Go To The Movies." A revision was titled "Amos 'n' Andy In Hollywood," and a more extensive revision was titled "Fresh Air Taxi." Silverman sought a license to use the "Amos 'n' Andy" characters but CBS refused.

Silverman filed this lawsuit seeking a declaration that the "Amos 'n' Andy" radio programs broadcast from March 1928 through March 1948 (the "pre–1948 radio programs") are in the public domain and that he is therefore free to make use of the content of the programs, including the characters, character names, and plots. He also sought a declaration that CBS has no rights in these programs under any body of law, including statutory and common law copyright law and trademark law. CBS asserted five counterclaims: (1) that Silverman's scripts infringed CBS's copyrights in the scripts for three post–1948 radio programs; (2) that the Silverman scripts violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982), by infringing various CBS trademarks, including "AMOS 'N' ANDY", the names of various characters such as "George ('Kingfish') Stevens," "Madame Queen," and "Lightnin'," and various phrases such as "Scuse me for protruding," "splain dat," and "Holy mackral" (perhaps Amos's best-known contribution to the language); (3) that the infringement of CBS's trademarks also violated CBS's rights under state unfair competition and anti-dilution law; (4) that Silverman had misappropriated CBS's goodwill associated with the "Amos 'n' Andy" programs and trademarks; and (5) that Silverman had obtained improper copyright registration of his first movie script, claiming it to be an original work, whereas it used protected material from scripts in which CBS held copyrights.

## District Court Decisions

Judge Goettel adjudicated the plethora of issues before him in three stages, writing thoughtful opinions at each stage. The initial decision granted in part and denied in part CBS's motion for summary judgment. *Silverman v. CBS*, 632 F.Supp. 1344 (S.D.N.Y.1986) (hereafter "*Silverman I*"). Judge Goettel ruled initially that since all of the works in which CBS claims a statutory copyright were created long before January 1, 1978, the effective date of the 1976 Copyright Act, 17 U.S.C. §§ 101–914 (1982 and Supp. IV 1986), the copyright issues were primarily governed by the Copyright Act of 1909. Act of March 4, 1909, ch. 320, 35 Stat. 1075. The District Judge then considered CBS's copyright claims with respect to the pre–1948 radio programs, the post–1948 radio programs, and the television programs.

With respect to the pre–1948 radio programs, Judge Goettel ruled that the scripts for these programs were in the public domain because the copyrights in these scripts, originally obtained by Gosden and Correll, had not been renewed. *Id.* at 1350. He also ruled that the broadcasts of these programs (presumably the audiotapes of the broadcasts) were entitled to common law copyright protection because the broadcasts did not constitute publication, and publication had not otherwise occurred. *Id.* That ruling, however, does not appear to have affected the judgment that was ultimately entered. The District Judge did not rule that Silverman's scripts infringed CBS's rights in the pre–1948 broadcasts, nor did he rule that Silverman was entitled to a declaration of the right to use material from these broadcasts. Judge Goettel expressed the view that though CBS had the right to prevent copying of "the sound recordings of the radio shows," CBS's rights in the pre–1948 programs were "immaterial" because Silverman did not plan to use recordings of these programs in his musical.[2] *Id.*

---

**2.** Though the District Court may have been correct in concluding that it is "immaterial" whether CBS retains copyrights in the pre–1948 radio broadcasts, its suggestion that CBS has copyrights in the sound recordings is incorrect.

These sound recordings were made prior to February 15, 1972, the date as of which Congress first extended copyright protection to sound recordings. Act of October 15, 1971, P.L. 92–140, 85 Stat. 391, as amended by Act of

Turning next to the post–1948 radio programs, Judge Goettel ruled that CBS had common law copyrights in the scripts for these programs, which became statutory copyrights pursuant to the 1976 Act when CBS registered these scripts with the Copyright Office in early 1985. *Id.* at 1351. The District Judge then found that Silverman had had access to the scripts and had listened to the broadcasts, that the first script for his musical indisputably contained substantial portions of dialogue from at least one of the post–1948 radio scripts, and that Silverman was therefore liable for copyright infringement.[3] *Id.* at 1351–52. Summary judgment was granted to CBS on its first and fifth counterclaims.

Turning next to the television programs, the District Judge noted that CBS had obtained copyright registrations and renewals for the televised programs (which were fixed in the tangible medium of film or videotape). He then rejected Silverman's claim that CBS had placed these telecasts in the public domain by publishing them without copyright notice. Recognizing that broadcasting the television programs was not publication, Silverman had nevertheless contended that CBS had made a sufficiently broad distribution of the programs to constitute publication by reason of the distribution of copies of the programs to affiliate and non-affiliate stations. Silverman relied primarily on the practice known as "bicycling," whereby one television station forwards the program to another. Judge Goettel expressed some doubt that the record assembled on summary judgment supported the claim, but ruled in any event that distribution of copies for "synchro-

nized national broadcast" was not a general publication. *Id.* at 1353–54.

Then, facing the issue of the scope of copyright protection for the television programs, Judge Goettel focused on the graphic representation of the "Amos 'n' Andy" characters in the telecasts. Mindful that the pre–1948 radio scripts were in the public domain, he framed the key question to be "are characters that are in the public domain in a literary work protectable by copyright in an audiovisual presentation?" *Id.* at 1355. The District Judge answered "yes" and ruled that "duplication of the characters as they appeared on television would infringe CBS's copyrights." *Id.* Reaching the issue of infringement, Judge Goettel then ruled that substantial similarity could not be determined until the characters in Silverman's musical were seen on stage, and he therefore dismissed the counterclaim as unripe to the extent that it sought relief for infringement of the television programs. *Id.*

On the trademark side of the case, Judge Goettel ruled that the name "Amos 'n' Andy," as well as the names and appearances of "Amos 'n' Andy" characters and "other distinctive features of the ... radio and television shows" are protectable marks. *Id.* at 1356. He then set down for trial the issue of whether CBS's non-use of the marks constituted abandonment. Finally, he ruled that the issue of trademark infringement, as well as the related issues of unfair competition and dilution, were premature in the absence of a staging of Silverman's musical. *Id.* at 1357–58.

After a bench trial on the issue of abandonment, Judge Goettel concluded that

---

December 31, 1974, P.L. 93–573, 88 Stat. 1873. As sound recordings, they therefore are not eligible for federal copyright protection. *See Lone Ranger Television, Inc. v. Program Radio Corp.,* 740 F.2d 718, 720 (9th Cir.1984); 1 *Nimmer on Copyright* § 2.10[B] (1988). If Silverman had planned to play the audiotapes of these broadcasts in his musical, CBS would have had to look to state law for protection. *See Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973). CBS makes no claim that it might have some basis for claiming infringement if Silverman sought to use, not the actual sounds contained on these tapes, but only some increments of expressive content beyond what

is contained in the public domain scripts, *e.g.,* ad-libbed dialogue or a further delineation of a character. We express no views on the availability of such a claim.

**3.** The District Court's opinion refers to infringement of both the post–1948 scripts and the post–1948 programs. Since the infringing material was dialogue that appeared in one of the scripts, it is the copyright in that script that was infringed. The programs added no additional dialogue that was copied by Silverman's script for his musical.

CBS had not abandoned its trademarks. *Silverman v. CBS*, 666 F.Supp. 575 (S.D.N.Y.1987) (*Silverman II*). Finally, upon CBS's motion for damages and an award of attorney's fees, the District Judge ordered Silverman to pay damages of $9,403.07 (representing the difference between $20,000 of revenue received from backers of his musical and expenses of $10,596.93), plus an attorney's fee of $10,000. *Silverman v. CBS*, 675 F.Supp. 870 (S.D.N.Y.1988) (*Silverman III*).

The final judgment entered in the District Court included several provisions. Silverman was enjoined from "creating ... distributing ... or offering for sale any script, or permitting the display or performance publicly of any musical play based thereon, bearing or containing any substantial copy or derivative work based upon any episode of an Amos 'n' Andy radio or television program created by or for CBS in or after August 1948...." He was also ordered to recall and deliver to CBS copies of the scripts titled "Amos 'n' Andy in Hollywood" and "Amos 'n' Andy Go To The Movies." The judgment declared that Silverman's copyright registration in his first script was void, that CBS's copyright registrations in episodes of the "Amos 'n' Andy" radio and television programs are valid, that the "characters' names and appearances and other distinctive features" of the "Amos 'n' Andy" radio and television shows are trademarks of CBS, and that CBS has not abandoned such marks. CBS was awarded damages and attorney's fees totaling $19,403.07. Finally, the judgment dismissed with prejudice all claims and counterclaims except CBS's second, third, and fourth counterclaims, which were dismissed without prejudice. This dismissal of all claims resulted in the denial of Silverman's claim for a declaration of his right to use any of the component parts of the pre–1948 radio programs, including the programs' titles, characters, characters' names, and plots. Though *Silverman I* had determined that the scripts for the pre–1948 radio programs were in the public domain, Silverman obtained no rights to their use because of the District Court's ruling that "AMOS 'N' ANDY" and the "Amos 'n' Andy" characters and phrases were protected trademarks of CBS.

## Discussion

We consider first the trademark side of this case because our conclusion on the trademark issues significantly alters the context in which the copyright issues arise.

1. *Trademark Issues.* Silverman challenges the District Court's rulings that CBS has protectable trademarks in the "Amos 'n' Andy" names, characters, and other features of the radio and television programs, including phrases of dialogue, and that CBS has not abandoned these marks. We find it unnecessary to decide which features of the programs might give rise to protectable marks because we agree with Silverman that CBS has abandoned the marks.

Section 45 of the Lanham Act provides:

A mark shall be deemed to be "abandoned"—

(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

15 U.S.C. § 1127 (1982). There are thus two elements for abandonment: (1) non-use and (2) intent not to resume use. *See Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir.1980). Two years of non-use creates a rebuttable presumption of abandonment. *Id.* at 1044.

On the undisputed facts of this case, CBS made a considered decision to take the "Amos 'n' Andy" television programs off the air. It took this action in response to complaints by civil rights organizations, including the NAACP, that the programs were demeaning to Blacks. By the time the abandonment issue came before the District Court, non-use of the AMOS 'N' ANDY marks had continued for 21 years. Although CBS has no current plans to use the marks within the foreseeable future, CBS asserts that it has always intended to resume using them at some point in the future, should the social climate become more hospitable.

■ Ordinarily, 21 years of non-use would easily surpass the non-use requirement for finding abandonment. *See, e.g., I.H.T. Corp. v. Saffir Publishing Corp.,* 444 F.Supp. 185 (S.D.N.Y.1978) (denying preliminary injunction to protect trademark after 12 years of non-use). The District Court concluded, however, that CBS had successfully rebutted the presumption of abandonment arising from its prolonged non-use by offering a reasonable explanation for its decision to keep the programs off the air and by asserting its intention to resume use at some indefinite point in the future. This conclusion raises a question as to the proper interpretation of the statutory phrase "intent not to resume": Does the phrase mean intent *never* to resume use or does it merely mean intent not to resume use within the reasonably foreseeable future?

We conclude that the latter must be the case. The statute provides that intent not to resume may be inferred from circumstances, and two consecutive years of non-use is prima facie abandonment. Time is thereby made relevant. Indeed, if the relevant intent were intent never to resume use, it would be virtually impossible to establish such intent circumstantially. Even after prolonged non-use, and without any concrete plans to resume use, a company could almost always assert truthfully that at some point, should conditions change, it would resume use of its mark.

We do not think Congress contemplated such an unworkable standard. More likely, Congress wanted a mark to be deemed abandoned once use has been discontinued with an intent not to resume within the reasonably foreseeable future. This standard is sufficient to protect against the forfeiture of marks by proprietors who are temporarily unable to continue using them, while it also prevents warehousing of marks, which impedes commerce and competition.

We are buttressed in this conclusion by the fact that the statute requires proof of "intent not to resume," rather than "intent to abandon." The statute thus creates no state of mind element concerning the ultimate issue of abandonment. On the contrary, it avoids a subjective inquiry on this ultimate question by setting forth the circumstances under which a mark shall be "deemed" to be abandoned. Of course, one of those circumstances is intent not to resume use, which is a matter of subjective inquiry. But we think the provision, by introducing the two concepts of "deemed" abandonment and intent not to resume use, contemplates a distinction, and it is a distinction that turns at least in part on duration of the contemplated non-use.

Congress's choice of wording appears to have been deliberate. One early version of what became section 45 of the Lanham Act had provided that "[i]ntent to *abandon* may be inferred from the circumstances." H.R. Rep. 4744, 76th Cong., 1st Sess. (1939) (emphasis added). However, shortly thereafter a new bill modified this phrase by substituting "[i]ntent not to resume" for "[i]ntent to abandon." H.R. Rep. 6618, 76th Cong., 1st Sess. (1939). Though it has been suggested that the phrases are interchangeable, *see* Note, 56 Fordham L.Rev. 1003, 1020 n. 113 (1988), we agree with the Fifth Circuit that the phrases are better understood as having distinct meanings. *See Exxon Corp. v. Humble Exploration Co.,* 695 F.2d 96, 102, 103 n. 7 (5th Cir. 1983). "Abandonment" connotes permanent relinquishment. *See Webster's Third New International Dictionary* 2 (1981) (defining "abandon" to mean "to cease to assert ... an interest ... esp. with the intent of *never* again resuming or reasserting it") (emphasis added). We think that Congress, by speaking of "intent not to resume" rather than "intent to abandon" in this section of the Act meant to avoid the implication that intent never to resume use must be shown.[4]

---

**4.** An early Supreme Court case involving abandonment under pre-Lanham Act, common law trademark said that proof of abandonment must include proof of an "intent to abandon." *Saxlehner v. Eisner & Mendelson Co.,* 179 U.S. 19,

31, 21 S.Ct. 7, 12, 45 L.Ed. 60 (1900). In cases applying the Act, we have also on occasion used the phrase "intent to abandon," *see Saratoga Vichy Spring Co. v. Lehman, supra,* 625 F.2d at 1044, but decisions using the phrase have not

This approach is consistent with our recent decisions concerning trademark abandonment. In *Saratoga Vichy Spring Co. v. Lehman, supra,* we rejected a claim of abandonment based on seven years of non-use where the initial decision to cease use resulted from a decision of the state legislature and the state, which was the trademark owner, continuously sought to sell the mark along with the mineral water business to which it applied. Similarly, in *Defiance Button Machine Co. v. C & C Metal Products Corp.,* 759 F.2d 1053 (2d Cir.), *cert. denied,* 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985), we rejected an abandonment claim where, during a brief period of non-use, the proprietor tried to sell the mark, its associated goodwill, and some other assets and, upon failing to find a buyer, became a subsidiary of a company in its original line of trade and prepared to resume its business. In both cases, the proprietor of the mark had an intention to exploit the mark in the reasonably foreseeable future by resuming its use or permitting its use by others.

The undisputed facts of the pending case are entirely different. Unlike the proprietors in *Saratoga Vichy* and *Defiance Button,* CBS has not been endeavoring to exploit the value of its marks, failing to do so only because of lack of business opportunities. Instead, it has decided, albeit for socially commendable motives, to forgo whatever business opportunities may currently exist in the hope that greater opportunities, unaccompanied by adverse public reaction, will exist at some undefined time in the future.

A proprietor who temporarily suspends use of a mark can rebut the presumption of abandonment by showing reasonable grounds for the suspension and plans to resume use in the reasonably foreseeable future when the conditions requiring suspension abate. *See, e.g., Star–Kist Foods, Inc. v. P.J. Rhodes & Co.,* 769 F.2d 1393 (9th Cir.1985); *Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531, 535 (2d Cir.1964); *Continental Distill-*

*ing Corp. v. Old Charter Distillery Co.,* 188 F.2d 614, 619–20 (D.C.Cir.1950). But a proprietor may not protect a mark if he discontinues using it for more than 20 years and has no plans to use or permit its use in the reasonably foreseeable future. A bare assertion of possible future use is not enough.

We recognize the point, forcefully made by Judge Goettel, when he wrote:

> It would be offensive to basic precepts of fairness and justice to penalize CBS, by stripping it of its trademark rights, merely because it succumbed to societal pressures and pursued a course of conduct that it reasonably believes to be in the best interests of the community.

*Silverman II,* 666 F.Supp. at 581. Nonetheless, we believe that however laudable one might think CBS's motives to be, such motives cannot overcome the undisputed facts that CBS has not used its marks for more than 20 years and that, even now, it has no plans to resume their use in the reasonably foreseeable future. Though we agree with Judge Goettel that CBS should not be penalized for its worthy motive, we cannot adjust the statutory test of abandonment to reward CBS for such motive by according it protection where its own voluntary actions demonstrate that statutory protection has ceased. Moreover, we see nothing in the statute that makes the consequence of an intent not to resume use turn on the worthiness of the motive for holding such intent.

■ We are also mindful of the facts, relied on by the District Court, that show some minor activities by CBS regarding its properties, allegedly sufficient to rebut abandonment of the marks. These are CBS's actions in licensing the programs for limited use in connection with documentary and educational programs, challenging infringing uses brought to its attention, renewing its copyrights, and periodically reconsidering whether to resume use of the programs. But challenging infringing uses

faced the issue whether the requisite intent is never to resume use or not to resume in the reasonably foreseeable future. Where that

choice matters, as in this case, the statutory phrase "intent not to resume" better describes the requisite mental element.

is not use, and sporadic licensing for essentially non-commercial uses of a mark is not sufficient use to forestall abandonment. *Cf. Exxon Corp. v. Humble Exploration Co., supra*, 695 F.2d at 102 (use must be "commercial use" to avoid abandonment). Such uses do not sufficiently rekindle the public's identification of the mark with the proprietor, which is the essential condition for trademark protection, nor do they establish an intent to resume commercial use. CBS's minor activities, like worthy motives for non-use, cannot dispel the legal consequence of prolonged non-use coupled with an intent not to resume use in the reasonably foreseeable future. *See Kirkland v. National Broadcasting Co.*, 425 F.Supp. 1111, 1117–18 (E.D.Pa.1976), *aff'd mem.*, 565 F.2d 152 (3d Cir.1977) (abandonment after 23–year period without commercial exploitation).

■ An adjudication of trademark rights often involves a balancing of competing interests. *See La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1274 n. 11 (2d Cir.1974). In weighing the competing interests and reaching our conclusion concerning abandonment, we are influenced in part by the context in which this dispute arises—one in which the allegedly infringing use is in connection with a work of artistic expression. Just as First Amendment values inform application of the idea/expression dichotomy in copyright law, *see Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 556, 105 S.Ct. 2218, 2228, 85 L.Ed.2d 588 (1985), in similar fashion such values have some bearing upon the extent of protection accorded a trademark proprietor against use of the mark in works of artistic expression.

■ Ordinarily, the use of a trademark to identify a commodity or a business "is a form of commercial speech and nothing more." *Friedman v. Rogers*, 440 U.S. 1, 11, 99 S.Ct. 887, 895, 59 L.Ed.2d 100 (1979). Requiring a commercial speaker to choose

words and labels that do not confuse or deceive protects the public and does not impair expression. *See, e.g., United States v. Ninety Five Barrels, More or Less, Alleged Cider Vinegar*, 265 U.S. 438, 443, 44 S.Ct. 529, 531, 68 L.Ed. 1094 (1924) ("It is not difficult to choose statements, designs and devices which will not deceive."); *cf. Vidal Sassoon, Inc. v. Bristol–Myers Co.*, 661 F.2d 272, 276 n. 8 (2d Cir.1981) (First Amendment concerns do not justify alteration of normal standard of preliminary injunctive relief on Lanham Act claim involving shampoo advertisements).

In the area of artistic speech, however, enforcement of trademark rights carries a risk of inhibiting free expression, *cf. L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 28–29 (1st Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987), not only in the case at hand but in other situations where authors might contemplate use of trademarks in connection with works of artistic expression. These risks add some weight to Silverman's claims.[5]

From the standpoint of the proprietor of a mark in a work of artistic expression, there is also an interest in expression, along with the traditional trademark interest in avoiding public confusion as to source. Trademark law can contribute to a favorable climate for expression by complementing the economic incentive that copyright law provides to create and disseminate artistic works, *see Harper & Row Publishers, Inc. v. Nation Enterprises, supra*, 471 U.S. at 558, 105 S.Ct. at 2229. In this case, however, the expression interest on CBS's side is markedly diminished by its decision to withhold dissemination of the works with which its marks are associated.

The interest of CBS, and the public, in avoiding public confusion, an interest obviously entitled to weight in every trademark case, is also somewhat diminished in the context of this case. This interest is not as weighty as in a case involving a non-artistic

---

**5.** Although *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir. 1979), rejected a movie theater's First Amendment defense to a trademark infringement claim, that ruling was in the context of a pornographic film that used blatantly false and misleading advertisements.

product whose trademark is associated with high quality or other consumer benefits. Though Silverman undoubtedly hopes that some of his audience will be drawn from those who favorably recall the "Amos 'n' Andy" programs, we doubt if many who attend Broadway musicals are motivated to purchase tickets because of a belief that the musical is produced by the same entity responsible for the movie, book, or radio or television series on which it is based: That is not to say that the musical is in a sufficiently distinct line of commerce to preclude all protection; the holder of a mark associated with a television series would normally be entitled to "bridge the gap" and secure some protection against an infringing use of the mark in connection with a Broadway musical. It is to say, however, that most theater-goers have sufficient awareness that the quality of a musical depends so heavily on a combination of circumstances, including script, score, lyrics, cast, and direction, that they are not likely to be significantly influenced in their ticket-purchasing decision by an erroneous belief that the musical emanated from the same production source as the underlying work.

■ The point must not be overstated. Trademark protection is not lost simply because the allegedly infringing use is in connection with a work of artistic expression. But in determining the outer limits of trademark protection—here, concerning the concept of abandonment—the balance of risks just noted is relevant and in some cases may tip the scales against trademark protection. These considerations are especially pertinent in the pending case where some aspects of the material claimed to be protected by trademark are in the public domain as far as copyright law is concerned.

For all of these reasons, we conclude that the undisputed facts establish abandonment of the AMOS 'N' ANDY marks.

2. *Copyright Issues.* As a result of our ruling on the trademark side of the case, it becomes more important than it was in the District Court to determine the extent to which CBS's copyrights prevent Silverman

from proceeding with his musical. Judge Goettel, though acknowledging that the pre–1948 radio scripts were in the public domain as far as copyright law was concerned, gave Silverman no declaration of any rights concerning the "Amos 'n' Andy" characters because of his ruling on the trademark side of the case. Our rejection of that ruling thus alters the context in which the copyright issues arise.

On this appeal, Silverman does not challenge the District Court's finding that his script for his musical infringes CBS's copyright in at least one of CBS's post–1948 radio scripts. He does assert the right to use the pre–1948 radio scripts and also contends that CBS lost its copyright in the television programs by distributing ("bicycling") them to local television stations without copyright notice affixed. In the view we take of this case, the rights of the parties that need to be adjudicated at this time may be determined without resolution of the validity of the CBS copyrights in the television programs. The validity of those copyrights appears to turn on the precise factual circumstances surrounding the distribution of the television programs, and those circumstances have not been sufficiently developed on this record. Development of that factual record, however, may await the production of Silverman's musical, since until then (and perhaps even after that point) the pending CBS claim of copyright infringement and Silverman's claim to a declaration of right to make some use of the "Amos 'n' Andy" material may be adjudicated without consideration of the validity of CBS's copyrights in the television programs.

■ The fundamental copyright principle applicable to this case is that a copyright affords protection only for original works of authorship and, consequently, copyrights in derivative works secure protection only for the incremental additions of originality contributed by the authors of the derivative works. *See* 1 *Nimmer on Copyright* §§ 2.01, 3.04 (1988). Thus, the CBS copyrights in the post–1948 radio scripts programs, and whatever rights it may have in the television scripts and pro-

grams (assuming for the moment that the programs have not been published without copyright notice) provide protection only for the increments of expression beyond what is contained in the pre–1948 radio scripts, which are in the public domain. This principle is fully applicable to works that provide further delineation of characters already sufficiently delineated to warrant copyright protection. *See Burroughs v. Metro–Goldwyn–Mayer, Inc.*, 683 F.2d 610, 631 (2d Cir.1982) (Newman, J., concurring).

This basic principle has some favorable consequences for both CBS and Silverman. For CBS, it means, as the District Court determined, that CBS is entitled to prevail on its claim that Silverman's script infringes the CBS copyright in at least one of the post–1948 radio scripts because significant dialogue appearing in that script (and not contained in the pre–1948 scripts) has been copied by Silverman in his script for his musical. For Silverman, the basic copyright principle means that he is entitled to use the public domain material from the pre–1948 scripts and may do so up to the point at which he copies original expression added to the pre–1948 radio scripts and protected by valid CBS copyrights.

 With respect to the "Amos 'n' Andy" characters, which are at the heart of this litigation, we have no doubt that they were sufficiently delineated in the pre–1948 radio scripts to have been placed in the public domain when the scripts entered the public domain. *See Nichols v. Universal Pictures Corp.*, 45 F.2d 119 (2d Cir.1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). What Silverman may not use, however, is any further delineation of the characters contained in the post–1948 radio scripts and the television scripts and programs, if it is ultimately determined that these last items remain protected by valid copyrights.

Judge Goettel recognized the basic principles that apply to the copyright claims of both sides but in one respect misapplied them, according CBS too much protection in implementing his conclusion that "characters that are in the public domain in a literary work [are] protectable by copyright in an audiovisual work." *Silverman I*, 632 F.Supp. at 1355. Though he correctly observed that "[t]he visual representation of these characters, recorded on film, is the expression of an idea that goes beyond the word portraits in the public domain scripts," he erred in concluding that "duplication of the characters as they appeared on television would infringe CBS's copyrights." *Id.* Since only the increments of expression added by the films are protectable, Silverman would infringe only if he copies these protectable increments. It is, of course, likely that the visual portrayal of the characters added something beyond the delineation contained in the public domain radio scripts, but surely not every visual aspect is protected. For example, the fact that the characters are visibly Black does not bar Silverman from placing Black "Amos 'n' Andy" characters in his musical, since the race of the characters was a feature fully delineated in the public domain scripts. Similarly, any other physical features adequately described in the pre–1948 radio scripts may be copied even though those characteristics are visually apparent in the television films or tapes.

3. *Relief.* There remains the determination of appropriate relief. Since Silverman does not challenge the award of damages for infringement of the post–1948 radio scripts, those damages and the related attorney's fees in the total amount of $19,403.07 are affirmed.

The situation concerning non-monetary relief is somewhat more complicated. The judgment awards CBS an injunction barring Silverman from creating a script, or a musical based on a script, "containing any substantial copy or derivative work based upon any episode of an Amos 'n' Andy radio or television program created by or for CBS in or after August 1948." It is not clear whether this injunction is designed to prohibit copying of any aspect of the post–1948 programs or, because of the word "episode," to prohibit copying only the plots of such episodes. The first possibility is too broad, and the second could be both too broad and too narrow (too broad if

some of the plots were in the public domain pre–1948 radio scripts and too narrow if the post–1948 copyrightable materials contain protectable elements in addition to plots).

What the injunction should prohibit is copying any of the protectable elements of the works in which CBS holds valid copyrights. Those works include the post–1948 radio scripts, the television scripts, and possibly the television programs (depending on the ultimate outcome of the "bicycling" dispute). The protectable elements of these copyrighted materials are those elements that constitute increments of expression additional to what is contained in the pre–1948 radio scripts and that satisfy the minimal copyright requirement of originality. Framing an injunction in terms of a legal conclusion concerning protectable increments of expression is not entirely satisfactory, but the alternative of trying to identify at this stage every protectable element of the copyrighted materials is even less satisfactory. Precise determination of such elements will have to await the situation, should it ever arise, where Silverman prepares a script that arguably infringes a protectable element of these materials and CBS asserts a claim of infringement. If in such a proceeding CBS claims that Silverman has infringed the protectable elements of a television program, the "bicycling" issue will also have to be determined.

We also defer precision in framing relief on Silverman's claim for a declaratory judgment. Silverman should now receive a declaration that he is entitled to use all aspects of the "Amos 'n' Andy" materials, including names, stories, and characters, to the extent that such elements of expression are contained (or, in the case of characters, to the extent delineated) in the pre–1948 radio scripts, which are in the public domain. As with the injunction, it is not satisfactory to leave the scope of this declaration imprecise, but it would be less satisfactory to attempt to identify all the unprotected elements that Silverman is free to use.

On balance, we think we have adjudicated the legal rights of Silverman and CBS sufficiently to minimize the likelihood of further controversy. Though future disputes might arise, Silverman will now have ample latitude to proceed with his musical, though observing the copyrights that CBS indisputably holds in the post–1948 radio scripts, and he may find it unnecessary to test the full extent of CBS's rights in other materials. With this opinion at hand, we will expect the parties to cooperate in either framing an agreed upon form of judgment for submission to the District Court on remand, or at least narrowing any disputes they may have and submitting variations of language only as to such disputes. In the event of a subsequent appeal from the entry of judgment upon remand, this panel will retain jurisdiction.

The judgment of the District Court is affirmed in part and vacated in part. Specifically, paragraphs 2, 4, 6, and 8 of the judgment are affirmed; paragraphs 1, 3, 5, and 7 are vacated;[6] paragraph 9 is affirmed to the extent that it dismisses CBS's second, third, and fourth counterclaims without prejudice and in all other respects is vacated; and the cause is remanded to the District Court for entry of a revised judgment, including declaratory and injunctive relief to CBS and declaratory relief to Silverman, all in accordance with this opinion.

Affirmed in part, vacated in part, and remanded. No costs.

---

**6.** Paragraph 7 allowed CBS its costs in the District Court. Our vacatur of that paragraph is without prejudice to such award of costs incurred in the trial court as the District Court may deem appropriate in view of the ultimate disposition of this litigation.