In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1128

LESLIE S. KLINGER,

*Plaintiff-Appellee,*

*v.*

CONAN DOYLE ESTATE, LTD.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 1226 — **Rubén Castillo**, *Chief Judge.*

ARGUED MAY 22, 2014 — DECIDED JUNE 16, 2014

Before POSNER, FLAUM, and MANION, *Circuit Judges.*

POSNER, *Circuit Judge.* Arthur Conan Doyle published his first Sherlock Holmes story in 1887 and his last in 1927. There were 56 stories in all, plus 4 novels. The final 10 stories were published between 1923 and 1927. As a result of statutory extensions of copyright protection culminating in the 1998 Copyright Term Extension Act, the American copyrights on those final stories (copyrights owned by Doyle's estate, the appellant) will not expire until 95 years after the

date of original publication—between 2018 to 2022, depend-ing on the original publication date of each story. The copy-rights on the other 46 stories and the 4 novels, all being works published before 1923, have expired as a result of a series of copyright statutes well described in *Societe Civile Succession Guino v. Renoir*, 549 F.3d 1182, 1189–90 (9th Cir. 2008).

Once the copyright on a work expires, the work becomes a part of the public domain and can be copied and sold without need to obtain a license from the holder of the ex-pired copyright. Leslie Klinger, the appellee in this case, co-edited an anthology called *A Study in Sherlock: Stories Inspired by the Sherlock Holmes Canon* (2011)—"canon" referring to the 60 stories and novels written by Arthur Conan Doyle, as op-posed to later works, by other writers, featuring characters who had appeared in the canonical works. Klinger's anthol-ogy consisted of stories written by modern authors but in-spired by, and in most instances depicting, the genius detec-tive Sherlock Holmes and his awed sidekick Dr. Watson. Klinger didn't think he needed a license from the Doyle es-tate to publish these stories, since the copyrights on most of the works in the "canon" had expired. But the estate told Random House, which had agreed to publish Klinger's book, that it would have to pay the estate $5000 for a copy-right license. Random House bowed to the demand, ob-tained the license, and published the book.

Klinger and his co-editor decided to create a sequel to *A Study in Sherlock*, to be called *In the Company of Sherlock Holmes*. They entered into negotiations with Pegasus Books for the publication of the book and W.W. Norton & Compa-ny for distribution of it to booksellers. Although the editors

hadn't finished the book, the companies could estimate its likely commercial success from the success of its predecessor, and thus decide in advance whether to publish and distribute it. But the Doyle estate learned of the project and told Pegasus, as it had told Random House, that Pegasus would have to obtain a license from the estate in order to be legally authorized to publish the new book. The estate didn't threaten to sue Pegasus for copyright infringement if the publisher didn't obtain a license, but did threaten to prevent distribution of the book. It did not mince words. It told Pegasus: "If you proceed instead to bring out *Study in Sherlock II* [the original title of *In the Company of Sherlock Holmes*] unlicensed, do not expect to see it offered for sale by Amazon, Barnes & Noble, and similar retailers. We work with those compan[ies] routinely to weed out unlicensed uses of Sherlock Holmes from their offerings, and will not hesitate to do so with your book as well." There was also a latent threat to sue Pegasus for copyright infringement if it published Klinger's book without a license, and to sue Internet service providers who distributed it. See Digital Millennium Copyright Act, 17 U.S.C. § 512(i)(1)(A). Pegasus yielded to the threat, as Random House had done, and refused to publish *In the Company of Sherlock Holmes* unless and until Klinger obtained a license from the Doyle estate.

Instead of obtaining a license, Klinger sued the estate, seeking a declaratory judgment that he is free to use material in the 50 Sherlock Holmes stories and novels that are no longer under copyright, though he may use nothing in the 10 stories still under copyright that has sufficient originality to be copyrightable—which means: at least a tiny bit of originality, *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 345 (1991) ("at least some minimal degree of crea-

tivity … the requisite level of creativity is extremely low"); *CDN Inc. v. Kapes*, 197 F.3d 1256, 1257, 1259–60 (9th Cir. 1999).

The estate defaulted by failing to appear or to respond to Klinger's complaint, but that didn't end the case. Klinger wanted his declaratory judgment. The district judge gave him leave to file a motion for summary judgment, and he did so, and the Doyle estate responded in a brief that made the same arguments for enlarged copyright protection that it makes in this appeal. The judge granted Klinger's motion for summary judgment and issued the declaratory judgment Klinger had asked for, thus precipitating the estate's appeal.

The appeal challenges the judgment on two alternative grounds. The first is that the district court had no subject-matter jurisdiction because there is no actual case or controversy between the parties. The second ground is that if there is jurisdiction, the estate is entitled to judgment on the merits, because, it argues, copyright on a "complex" character in a story, such as Sherlock Holmes or Dr. Watson, whose full complexity is not revealed until a later story, remains under copyright until the later story falls into the public domain. The estate argues that the fact that early stories in which Holmes or Watson appeared are already in the public domain does not permit their less than fully "complexified" characters in the early stories to be copied even though the stories themselves are in the public domain.

But jurisdiction first. Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies (terms that appear to be synonyms), which is to say to actual legal disputes. It would be very nice to be able to ask federal judges for legal advice—if I do thus and so, will I be subject

to being sued and if I am sued am I likely to lose and have to pay money or even clapped in jail? But that would be advisory jurisdiction, which, though it exists in some states and foreign countries, see, e.g., Nicolas Marie Kublicki, "An Overview of the French Legal System From an American Perspective," 12 *Boston University Int'l L.J.* 57, 66, 78–79 (1994), is both inconsistent with Article III's limitation of federal jurisdiction to actual disputes, thus excluding jurisdiction over merely potential ones, and would swamp the federal courts given these courts' current caseload, either leaving the judges little if any time for adjudicating disputes or requiring that judges' staffs be greatly enlarged.

So no advisory opinions in federal courts. Declaratory judgments are permitted but are limited—also to avoid transgressing Article III—to "case[s] of actual controversy," 28 U.S.C. § 2201(a), that is, actual legal disputes. Had Klinger had no idea how the Doyle estate would react to the publication of *In the Company of Sherlock Holmes*, he could not have sought a declaratory judgment, because he would not have been able to demonstrate that there was an actual dispute. He could seek advice, but not from a federal judge. But the Doyle estate had made clear that if Klinger succeeded in getting his book published the estate would try to prevent it from being sold by asking Amazon and the other big book retailers not to carry it, implicitly threatening to sue the publisher, as well as Klinger and his co-editor, for copyright infringement if they defied its threat. The twin threats—to block the distribution of the book by major retailers and to sue for copyright infringement—created an actual rather than merely a potential controversy. This is further shown by the fact that Klinger could have sued the estate for having

committed tortious interference with advantageous business relations by intimidating his publisher.

So he's been injured and seeks a judicial declaration that the conduct by the Doyle estate that caused the injury violated his legal rights because the threat was based on a groundless copyright claim. Only if Klinger obtains the declaration will he be able to publish his book without having to yield to what he considers extortion.

Compare the more common example of a suit by an insurance company seeking a judicial declaration that it has no obligation to defend or indemnify its insured. The company prefers to seek declaratory relief rather than waiting to be sued by the insured and defending against the suit because if it lost that suit it might be ordered to pay punitive damages. This case is similar. Klinger doesn't want to publish his book before his controversy with the Doyle estate is resolved, for if he does he'll be facing the prospect not only of being enjoined from selling the book but also of having to pay damages if the estate sues him for copyright infringement and wins. Even if the book's sales turn out to be modest, and actual damages (as measured by losses of sales by competing editions licensed by the estate) therefore small, the estate would be entitled, for each copyrighted work infringed, to up to $30,000 in statutory damages and up to $150,000 if the court determined that Klinger had infringed the estate's copyrights willfully. 17 U.S.C. §§ 504(c)(1), (2). Anyway he *can't* publish his book; his publisher is unwilling to take a chance on publishing it, given the estate's threat to impede distribution. And to be effective and thus harm the person seeking declaratory relief, a threat need not be a

threat to sue. See, e.g., *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 132 (2007).

The estate argues that Klinger's suit is premature ("unripe" in legal jargon), and therefore not yet an actual controversy and so not within the jurisdiction of the federal courts, for until the book is completed (and thus can be read), how is one to decide whether it infringes? That would be a good argument in many cases but not in the present one, because the only issue presented by Klinger's quest for a declaratory judgment is one of law: whether he is free to copy the characters of Holmes and Watson as they are depicted in the stories and novels of Arthur Conan Doyle that are in the public domain. To answer that question requires no knowledge of the contents of the book. A different question is whether the book will infringe the estate's unexpired copyrights, and to answer *that* question would require knowledge of the contents. But that question is not presented by this suit. Klinger avers that his book will contain no original and therefore copyrightable material that appears only in the last ten stories, which are still under copyright, but only material that appears in the public-domain works. If he's lying, the estate will have a remedy when the book is published. To require him to defer suit until he finishes the book would gratuitously discourage declaratory-judgment suits by authors and publishers threatened with suits for copyright infringement or with boycotts by distributors—and so would discourage authors from ever writing such works in the first place.

There is still another jurisdictional wrinkle. Apparently because of a mislabeling of certain exhibits, the district judge was under the impression that Klinger's suit was challenging the copyrights on the ten stories published after 1922,

and so he denied summary judgment insofar as those stories were concerned. That makes it seem as if there were no final judgment in the district court, in which event we would not have jurisdiction of the appeal, as there is no suggestion that there is any basis for an interlocutory appeal. The plaintiff claims, however, not to be challenging the copyrights on the last ten stories. And the claim is correct, for he acknowledges that those copyrights are valid and that the only copying he wants to include in his book is copying of the Holmes and Watson characters as they appear in the earlier stories and in the novels. The summary judgment ruling on the last ten stories was a mistake, and can be ignored. Nothing remains in the district court. The declaratory judgment issued by the district judge, limited entirely to the earlier works, ended the litigation in that court.

So the judge was right to assert (and retain) jurisdiction over the case, and we come to the merits, where the issue as we said is whether copyright protection of a fictional character can be extended beyond the expiration of the copyright on it because the author altered the character in a subsequent work. In such a case, the Doyle estate contends, the original character cannot lawfully be copied without a license from the writer until the copyright on the later work, in which that character appears in a different form, expires.

We cannot find any basis in statute or case law for extending a copyright beyond its expiration. When a story falls into the public domain, story elements—including characters covered by the expired copyright—become fair game for follow-on authors, as held in *Silverman v. CBS Inc.*, 870 F.2d 40, 49–51 (2d Cir. 1989), a case much like this one. At issue was the right to copy fictional characters (Amos and Andy)

who had appeared in copyrighted radio scripts. The copyrights covered the characters because they were original. As in this case the characters also appeared in subsequent radio scripts that remained under copyright, though the copyrights on the original scripts in which the characters had appeared had expired. The court ruled that "a copyright affords protection only for original works of authorship and, consequently, copyrights in derivative works secure protection only for the incremental additions of originality contributed by the authors of the derivative works." *Id*. at 49; see Leslie A. Kurtz, "The Methuselah Factor: When Characters Outlive Their Copyrights," 11 *U. Miami Entertainment & Sports L. Rev.* 437, 447–48 (1994). The copyrights on the derivative works, corresponding to the copyrights on the ten last Sherlock Holmes stories, were not extended by virtue of the incremental additions of originality in the derivative works.

And so it is in our case. The ten Holmes-Watson stories in which copyright persists are derivative from the earlier stories, so only original elements added in the later stories remain protected. *Id*. at 49–50. The "freedom to make new works based on public domain materials ends where the resulting derivative work comes into conflict with a valid copyright," *Warner Bros. Entertainment, Inc. v. X One X Productions*, 644 F.3d 584, 596 (8th Cir. 2011)—as Klinger acknowledges. But there is no such conflict in this case.

Lacking any ground known to American law for asserting post-expiration copyright protection of Holmes and Watson in pre-1923 stories and novels going back to 1887, the estate argues that creativity will be discouraged if we don't allow such an extension. It may take a long time for an

author to perfect a character or other expressive element that first appeared in his early work. If he loses copyright on the original character, his incentive to improve the character in future work may be diminished because he'll be competing with copiers, such as the authors whom Klinger wishes to anthologize. Of course this point has no application to the present case, Arthur Conan Doyle having died 84 years ago. More important, extending copyright protection is a two-edged sword from the standpoint of inducing creativity, as it would reduce the incentive of subsequent authors to create derivative works (such as new versions of popular fictional characters like Holmes and Watson) by shrinking the public domain. For the longer the copyright term is, the less public-domain material there will be and so the greater will be the cost of authorship, because authors will have to obtain licenses from copyright holders for more material—as illustrated by the estate's demand in this case for a license fee from Pegasus.

Most copyrighted works include some, and often a great deal of, public domain material—words, phrases, data, entire sentences, quoted material, and so forth. The smaller the public domain, the more work is involved in the creation of a new work. The defendant's proposed rule would also encourage authors to continue to write stories involving old characters in an effort to prolong copyright protection, rather than encouraging them to create stories with entirely new characters. The effect would be to discourage creativity.

The estate offers the hypothetical example of a mural that is first sketched and only later completed by being carefully painted. If the sketch is allowed to enter the public domain, there to be improved by creative copiers, the mural artist

will have a diminished incentive to perfect his mural. True; but other artists will have a greater incentive to improve it, or to create other works inspired by it, because they won't have to pay a license fee to do so provided that the copyright on the original work has expired.

The estate asks us to distinguish between "flat" and "round" fictional characters, potentially a sharper distinction than the other one it urges (as we noted at the beginning of this opinion), which is between simple and complex. Repeatedly at the oral argument the estate's lawyer dramatized the concept of a "round" character by describing large circles with his arms. And the additional details about Holmes and Watson in the ten late stories do indeed make for a more "rounded," in the sense of a fuller, portrayal of these characters. In much the same way we learn things about Sir John Falstaff in *Henry IV, Part 2*, in *Henry V* (though he doesn't actually appear in that play but is merely discussed in it), and in *The Merry Wives of Windsor*, that were not remarked in his first appearance, in *Henry IV, Part 1*. Notice also that *Henry V*, in which Falstaff is reported as dying, precedes *The Merry Wives*, in which he is very much alive. Likewise the ten last Sherlock Holmes stories all are set before 1914, which was the last year in which the other stories were set. One of the ten, *The Adventure of the Veiled Lodger* (published in 1927), is set in 1896. See 2 William S. Baring-Gould, *The Annotated Sherlock Holmes* 453 (1967). Thus a more rounded Holmes or Watson (or Falstaff) is found in a later work depicting a younger person. We don't see how that can justify extending the expired copyright on the flatter character. A contemporary example is the six *Star Wars* movies: Episodes IV, V, and VI were produced before I, II, and III. The Doyle estate would presumably argue that the copyrights on the charac-

ters as portrayed in IV, V, and VI will not expire until the copyrights on I, II, and III expire.

The estate defines "flat" characters oddly, as ones completely and finally described in the first works in which they appear. Flat characters thus don't evolve. Round characters do; Holmes and Watson, the estate argues, were not fully rounded off until the last story written by Doyle. What this has to do with copyright law eludes us. There are the early Holmes and Watson stories, and the late ones, and features of Holmes and Watson are depicted in the late stories that are not found in the early ones (though as we noted in the preceding paragraph some of those features are retrofitted to the earlier depictions). Only in the late stories for example do we learn that Holmes's attitude toward dogs has changed—he has grown to like them—and that Watson has been married twice. These additional features, being (we may assume) "original" in the generous sense that the word bears in copyright law, are protected by the unexpired copyrights on the late stories. But Klinger wants just to copy the Holmes and the Watson of the early stores, the stories no longer under copyright. The Doyle estate tells us that "no workable standard exists to protect the Ten Stories' incremental character development apart from protecting the completed characters." But that would be true only if the early and the late Holmes, and the early and the late Watson, were indistinguishable—and in that case there would be no incremental originality to justify copyright protection of the "rounded" characters (more precisely the features that makes them "rounder," as distinct from the features they share with their earlier embodiments) in the later works.

It's not unusual for an author to use the same character in successive works, yet with differences resulting, in the simplest case, just from aging. In Shakespeare's two *Henry IV* plays, the Henry who later becomes Henry V is the Prince of Wales, hence Crown Prince of England; in *Henry V* he is the King of England. Were *Henry IV* in the public domain and *Henry V* under copyright, Henry Prince of Wales could be copied without Shakespeare's permission but not Henry V. Could the Doyle estate doubt this? Could it think Holmes a more complex and altered character than Henry?

The more vague, the less "complete," a character, the less likely it is to qualify for copyright protection. An author "could not copyright a character described merely as an unexpectedly knowledgeable old wino," but could copyright "a character that has a specific name and a specific appearance. Cogliostro's age, obviously phony title ('Count'), what he knows and says, his name, and his faintly Mosaic facial features combine to create a distinctive character. No more is required for a character copyright." *Gaiman v. McFarlane*, 360 F.3d 644, 660 (7th Cir. 2004); see also *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (L. Hand, J.). From the outset of the series of Arthur Conan Doyle stories and novels that began in 1887 Holmes and Watson were distinctive characters and therefore copyrightable. They were "incomplete" only in the sense that Doyle might want to (and later did) add additional features to their portrayals. The resulting somewhat altered characters were derivative works, the additional features of which that were added in the ten late stories being protected by the copyrights on those stories. The alterations do not revive the expired copyrights on the original characters.

We can imagine the Doyle estate being concerned that a modern author might write a story in which Sherlock Holmes was disparaged (perhaps by being depicted as a drug dealer—he was of course a cocaine user—or as an idiot detective like Inspector Clouseau of the *Pink Panther* movies), and that someone who read the story might be deterred from reading Doyle's Sherlock Holmes stories because he would realize that he couldn't read them without puzzling confusedly over the "true" character of Sherlock Holmes. The analogy would be to trademark dilution, see, e.g., *Hyatt Corp. v. Hyatt Legal Services*, 736 F.2d 1153, 1157–59 (7th Cir. 1984), as if a hot-dog stand advertised itself as "The Rolls-Royce Hot-Dog Stand." No one would be confused as to origin—Rolls-Royce obviously would not be the owner. Its concern would be that its brand would be diminished by being linked in people's involuntary imagination to a hot-dog stand; when they thought "Rolls-Royce," they would see the car and the hot-dog stand—an anomalous juxtaposition of high and low. There is no comparable doctrine of copyright law; parodies or burlesques of copyrighted works may or may not be deemed infringing, depending on circumstances, see *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580–81 and n. 14, 588, 591 (1994), but there is no copyright infringement of a story or character that is not under copyright. Anyway it appears that the Doyle estate is concerned not with specific alterations in the depiction of Holmes or Watson in Holmes-Watson stories written by authors other than Arthur Conan Doyle, but with *any* such story that is published without payment to the estate of a licensing fee.

With the net effect on creativity of extending the copyright protection of literary characters to the extraordinary lengths urged by the estate so uncertain, and no legal

grounds suggested for extending copyright protection beyond the limits fixed by Congress, the estate's appeal borders on the quixotic. The spectre of perpetual, or at least nearly perpetual, copyright (perpetual copyright would violate the copyright clause of the Constitution, Art. I, § 8, cl. 8, which authorizes copyright protection only for "limited Times") looms, once one realizes that the Doyle estate is seeking 135 years (1887–2022) of copyright protection for the character of Sherlock Holmes as depicted in the first Sherlock Holmes story.

AFFIRMED.