NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 11, 2015[*]
Decided October 1, 2015

**Before**

JOEL M. FLAUM, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 14-3355

| | |
|---|---|
| CAROL SISSOM, | Appeal from the United States District |
|    *Plaintiff-Appellant*, | Court for the Southern District of |
| | Indiana, Indianapolis Division. |
| *v.* | |
| | No. 1:13-cv-882-WTL-TAB |
| ROBERT SNOW, et al., | |
|    *Defendants-Appellees*. | William T. Lawrence, |
| | *Judge*. |

## O R D E R

The circumstances surrounding the investigation of three murders in Indianapolis, Indiana, provided the subject matter for two non-fiction books, a 2006 book by Carol Sissom, and a 2012 book by Robert Snow. In this appeal challenging the dismissal of her suit against Snow and his booksellers, Sissom contends that Snow's book infringes on the copyright of her composition. Because Snow's book restates only

---

[*] After examining the briefs and record, we have concluded that oral argument is unnecessary. Thus, the appellant's motion for an oral hearing is denied, and the appeal is submitted on the briefs and record. *See* FED. R. APP. P. 34(a)(2)(C).

historical events, the defendants did not infringe on any protected expression, so we affirm.

In December 1971 three Indianapolis businessmen were murdered at a house on the city's east side. Police were unable to solve the crime, which gained notoriety as the years passed and no one was identified as the assailant. The case was still cold 20 years later when Sissom, a freelance journalist, became interested in it. She first investigated the case while writing a series of newspaper articles, and then continued the investigation for its own sake. Eventually Sissom believed she had found the killers, concluding that they were motivated either by jealousy or secret payments from the Nixon Administration to cover up illegal campaign contributions from Jimmy Hoffa. The men accused by Sissom were charged with the murders, but the charges were quickly dropped, and the case remained open. In 2003 the Indianapolis police received a letter confessing to the murders. Sissom got wind of the confession, and, believing it to have validated her work, soon memorialized her investigation and conclusions in book form, first in her 2006 book *The LaSalle Street Murders*, and a few years later in a trilogy bearing the same name.

The 2003 letter, which had been written by an individual other than those charged in connection with Sissom's investigation, prompted an Indianapolis detective to take a fresh look at the case. That detective ultimately concluded that the letter's author, who claimed that he had been paid to commit the murders in order to obtain an insurance payout, was telling the truth. On the basis of the detective's conclusion, the Indianapolis police decided to close the case. That closure precipitated Robert Snow's *Slaughter on North LaSalle*, a book detailing the original investigation, Sissom's work in the 90s, and the case's conclusion.

Though critical of Sissom's methods and conclusions, the middle third of Snow's account relies heavily on Sissom's 2006 work, and he credits Sissom's book as his source of information about her investigation and findings. In that middle portion, Snow restates many historical facts that appear in *The LaSalle Street Murders*. We provide three illustrative examples.

First, early on in her book, Sissom explained how she began her investigation: "I made my first inquiry at the Marion County Public Library. It was there that a woman told me about a sensational murder case that happened when I was just a small school girl. . . . When I looked at my calendar I realized that the 20-year anniversary of the LaSalle Street Murders was coming up." Snow summarized this information about

Sissom's start as follows: "Eventually, a librarian at the Indianapolis Marion County Public Library pointed [Sissom] toward the North LaSalle Street Murders, still unsolved and whose twentieth anniversary was coming up in December of that year." A second example reflects how Sissom got her first "break" in the case. She wrote that it came when she located a potential witness: "My second goal was to find [Margo], the waitress at the bar, 'Tommy's Starlight Palladium' in 1971. . . . With a little tenacity—and the speed of the fingers on my right hand dancing on my telephone keyboard, I found [Margo]! She was a go-go dancer at a seedy establishment near South Meridian Street, not too far from downtown Indianapolis." Snow recapped how Sissom found Margo: "Next, [Sissom] set out to find the woman named Margo, whom she said she eventually located working at a run-down bar in Indianapolis." As a final example, Sissom elaborated on her interaction with Floyd Chastain, a convicted murderer incarcerated in a Florida state prison and one of the men she eventually accused of the murders. About their first conversation Sissom wrote: "The next day, I received a call that I will never forget as long as I live. It was a phone call that pierced my afternoon with both excitement and terror at the same time. It was about 2:20 p.m. and a brilliant, sunny day." Snow summarized the same events: "But then, on September 1st, 1992, Chastain called [Sissom] from the prison in Florida."

Similarities like these in Snow's book prompted Sissom to bring this action for copyright infringement against Snow and others in the chain of distribution. Sissom's complaint asserted generally that part of Snow's book was an unlawful paraphrase of her own works on the subject, and she later identified 194 specific instances (of which we have just given three representative examples) where *Slaughter on North LaSalle*, she believed, unlawfully copied from *The LaSalle Street Murders*. (Sissom also brought claims for intentional infliction of emotional distress and defamation, but she voluntarily dismissed those supplemental claims with prejudice, and then repleaded only the copyright claim, so we forgo any analysis of those supplemental claims.)

The defendants moved to dismiss the complaint for failure to state a claim, and submitted to the district court the two books that we have mentioned and that Sissom discusses throughout her complaint. The district court granted the motion, concluding that Snow's book relied on Sissom's only for non-copyrightable facts, and so the defendants were entitled to judgment as a matter of law. Sissom asked the court to reconsider, asserting that she should to be permitted to replead or discover facts in support of her claim. The court denied her motion.

Before we turn to the merits of Sissom's arguments on appeal, we consider the procedural posture of the case. The district court resolved the case under FED. R. CIV. P. 12(b)(6) while also considering the books themselves, material technically outside the pleadings. The court reasoned that books were incorporated by reference into Sissom's complaint, but the authority on which the district court relied to consider the books' content expressly declined to endorse using Rule 12(b)(6) for this course of action, instead treating the consideration of matters outside the pleadings as a ruling on summary judgment. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 691 (7th Cir. 2012); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002). Moreover, the complaint refers to multiple books by Sissom, not just *The LaSalle Street Murders*, and the district court was obligated to consider the entire complaint, including *all* material incorporated by reference. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).

Any error, however, is harmless. Sissom does not contend that she was caught off guard by the court's effective conversion of the defendant's motion to one for summary judgment. Nor does she contend that any of the books not in the record contained content, copyrightable or otherwise, necessary to resolve her claim. And, of course, since the district court's judgment rests on a conclusion of law—that the material in Sissom's book is not entitled to copyright protection, *see Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*, 372 F.3d 913, 919 (7th Cir. 2004)—our review is plenary, regardless of the procedural context.

Turning to the merits, Sissom concedes that Snow could lawfully use factual bits and pieces of her work, but contends that his extensive reliance on her book infringed upon her copyright. Sissom correctly points out that the middle portion of Snow's book essentially restates the same chronology of events and the conclusions that Sissom reached in hers, using the third person rather than the first. Sissom appears to invoke the concept of a derivative work, which the Copyright Act defines as "a work based upon one or more preexisting works," a definition that includes works "consisting of editorial revisions, annotations, or elaborations." 17 U.S.C. § 101; *see generally Gracen v. Bradford Exchange*, 698 F.2d 300 (7th Cir. 1983). The creator of a derivative work infringes on the protected portion of the original unless that person obtains a license from the owner of the underlying copyright. *See Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 523 (7th Cir. 2009).

But none of the material that Sissom says is taken from her book is derivative of *protectable* material. The middle part of Snow's book, from the chronology of Sissom's

investigation to her ultimate conclusions, simply restates historical events—the murder investigation and Sissom's role in it—and adds a bit of Snow's own commentary about those events. It is a foundation of copyright law that only the *form* of an author's expression is protectable, not the facts or ideas being expressed. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985). This principle remains true no matter how much factual content is borrowed. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 349–50 (1991); *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 978 (2d Cir. 1980) ("[B]road latitude must be granted to subsequent authors who make use of historical subject matter, including theories or plots."). Because Snow merely retold historical events using his own, more succinct style of expression, he did not appropriate any copyrightable expression. Therefore Sissom's copyright claim fails.

Sissom counters that her book is not entirely factual, and thus Snow's retelling necessarily infringes on her creation. To prove that her account is part fiction, she refers us to the "Disclaimer Page" that prefaces *The LaSalle Street Murders.* But that page undercuts her argument. There, she emphasizes that the book is "the true story" and "every part of this book is accurate," consisting of "verif[ied] facts." Based on her admission, then, the book's content is unprotected factual material. It is true that later in the disclaimer she backpedals, suggesting that some parts of her book "have been fictionalized in order to move the story along." But in her complaint and her opposition to the motion to dismiss, she asserts that the defendants infringed only on those portions of her book that describe "her feelings, perceptions, thoughts and actions." These are actual, historical events. This acknowledgement in her pleadings binds her on our review of the district court's ruling. *See Specht v. Google Inc.*, 747 F.3d 929, 933 (7th Cir. 2014). And since, as we have observed, historical truth is not protected expression, she fails to support her federal claim for infringement.

In addition to her federal claim, Sissom raises a host of novel, confusing, and ultimately meritless arguments generally based on Indiana common law. Asserting that Snow's work has invaded her privacy, she first refers us to the common law of copyright. Any argument grounded in a right of privacy is puzzling, given that Sissom published her own book and inserted herself into the historical record of the case. (For that reason, we reject her attempt to seek relief under the tort of invasion of privacy by false light.) But in any event, while the common law of copyright could be invoked in limited circumstances to protect personal privacy, *see Harper & Row*, 471 U.S. at 554, it does not apply here because it was abolished for works like Sissom's created after 1977, *see Hays v. Sony Corp.*, 847 F.2d 412, 415 (7th Cir. 1988). Sissom also appears to allege something akin to trademark dilution, *cf. Klinger v. Conan Doyle Estate, Ltd.*, 755 F.3d 496,

503 (7th Cir. 2014), but that argument gets her nowhere. Trademark dilution has no analogue in copyright, *see id.*, and in any case to be successful the claim would require some underlying copyrightable expression, *see Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 429–30 (2003), which is absent here. Sissom finally seeks to revive her voluntarily dismissed defamation claim. But she chose to dismiss it with prejudice, and she has given us no reason to conclude that the district court erred in honoring that choice. *See Palka v. City of Chicago*, 662 F.3d 428, 436 (7th Cir. 2011).

Finally, the district court did not abuse its discretion in refusing to allow Sissom to "start over" with a fresh complaint based on the same two books. Any amendment alleging infringement based on the same facts would be futile. *See Gandhi v. Sitara Capital Mgmt., Inc.*, 721 F.3d 865, 869 (7th Cir. 2013).

AFFIRMED.