ITC LIMITED and ITC Hotels Limited, Plaintiffs,

v.

PUNCHGINI, INC. d/b/a Bukhara Grill, Bukhara Grill II, Inc., Raja Jhanjee, Paragnesh Desai, Vicky Vij, Dhandu Ram, Mahendra Singh, and Bachan Rawat, Defendants.

No. 03 Civ. 1306(GEL).

United States District Court, S.D. New York.

Feb. 10, 2005.

Ethan Horwitz, Kandis M. Koustenis, Goodwin Procter LLP, New York City, for Plaintiffs ITC Limited and ITC Hotels Limited.

Edward J. Handler, III, Michelle Mancino Marsh, Kenyon & Kenyon, New York City, for Defendants Punchgini, Inc., Bukhara Grill II, Inc., Raja Jhanjee, Paragnesh Desai, Vicky Vij, Dhandu Ram, Mahendra Singh and Bachan Rawat.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiffs ITC Limited and ITC Hotels Limited (collectively, "ITC") sue defendant Punchgini, Inc. and its principals, alleging defendants' "Bukhara Grill," a restaurant with, until recently, two locations in Manhattan, infringes upon ITC's rights in the "Bukhara" trademark and dress associated with its own "Bukhara" restaurants located throughout the world. Defendants move for summary judgment dismissing the complaint in its entirety, and separately move in limine to exclude the testimony of ITC's expert witness. The summary judgment motion will be granted in its entirety, mooting the motion in limine.

## BACKGROUND

Plaintiffs ITC Limited and ITC Hotels Limited are large Indian corporations engaged in a variety of ventures, including ownership of the Maurya Sheraton Hotel & Towers in New Delhi, India.[12] The Maurya Sheraton complex contains a handful of restaurants, including "Bukhara," which opened in 1977, and is named for the legendary Great Silk Road city in Uzbekistan. (P.R. 56.1 Stmt. ¶ 84; Marsh Reply Decl. Ex. 35.) As conceived by ITC, the menu of the New Delhi "Bukhara" is drawn from the cuisine of the "North West Frontier" region of India, with a decor to match: "The restaurant's look is pure Flintstones: walls of boulders, solid-wood tables and menus printed on laminated sections of tree." (*Curry Without the Hurry*, Time, Dec. 23, 2002, Koustenis Decl. Ex. 60; *see also* P.R. 56.1 Stmt. ¶¶ 84–86; Draft Concept Note, Koustenis Decl. Ex. 54.) Acting as either operators

---

1. Unless otherwise indicated, the facts presented here are those admitted by ITC in response to the Local Rule 56.1 Statement submitted by defendants in support of their motion for summary judgment.

2. In briefing these motions, the parties submitted extensive materials under seal. All materials are hereby unsealed to the extent used in this Opinion and Order.

or franchisers, ITC replicated its flagship "Bukhara" restaurant at locations throughout the world, including Ajman, Bangkok, Hong Kong, Kathmandu, Montreal, and Singapore. (P.R. 56.1 Stmt. ¶ 88.) ITC also opened a "Bukhara" in New York in 1986, and licensed use of the "Bukhara" mark, for which it had obtained United States trademark registration for restaurant services in 1987, to a Chicago restaurateur that same year. ITC's award-winning "Bukhara" restaurants have garnered significant media attention in the past quarter-century. (P.R. 56.1 Stmt. ¶¶ 95–98, 105–106; Koustenis Decl. Exs. 59–71, 78, 80, 81 (collecting media reports touting various "Bukhara" restaurants and awards).)

The New York ITC "Bukhara" closed in 1991, and ITC terminated its licensing agreement with the Chicago "Bukhara" on August 28, 1997. Since terminating the Chicago licensing agreement, ITC has not owned, operated, or licensed a restaurant in the United States using the "Bukhara" mark or dress. ITC asserts that it has continued to seek out appropriate business partners to open a "Bukhara" restaurant in the United States, a contention strongly disputed by defendants in defending against ITC's trademark infringement claims, *see* Part II below. In the past three years, ITC, in partnership with its U.S. importer, King Maker Marketing, has begun marketing a line of packaged food products in the United States, including "Dal Bukhara," derived from the dish of that name served at ITC's New Delhi "Bukhara," and has applied for trademark registrations for the "Bukhara" mark in connection with food products. (Sekhar Aff. ¶¶ 21–25; Marsh Decl. Ex. 6 (trademark registration applications).)

When this litigation began, defendants owned two restaurants in New York City, "Bukhara Grill" and "Bukhara Grill II." [3] The first of these restaurants was opened in 1999, and the second in 2001. Defendants Vicky Vij, Raja Jhanjee, Mahendra Singh, Bachan Rawat, and Dhandu Ram, all employees of defendant Punchgini, Inc., were previously employed by ITC. (D. Objections and Responses to Plaintiffs' First Set of Interrogatories, Koustenis Decl. Ex. 52, at 5–6.) ITC alleges that many aspects of defendants' "Bukhara Grill" restaurants are borrowed from its "Bukhara" franchise, including the rustic decor, heavy wooden menus, use of checkered bibs in lieu of napkins, and logo font. (P. Opp. Mem.18.)

On March 22, 2000, counsel for ITC sent defendant Raja Jhanji a letter informing him of ITC's registration of the "Bukhara" mark, charging Punchgini, Inc. with "passing off [their] new business as that of" ITC, and threatening legal proceedings unless defendants desisted from use of the "Bukhara" mark and compensated ITC accordingly. (Marsh Decl. Ex. 23.) Defendants' counsel responded that their preliminary investigation showed no present use of the "Bukhara" mark by ITC in the United States, and encouraged discussions between the parties to avoid litigation. (Marsh Decl. Ex. 24.) In June and July, 2000, defendants' counsel attempted to engage ITC's counsel in discussion of their clients' respective rights, stating they

---

**3.** In a letter of October 13, 2004, ITC informed the Court that "Bukhara Grill II" had been renamed "Khyber Grill," which appears to be the name of yet another restaurant owned by ITC in Chennai, India. ITC considers this to be an act of bad faith on the part of defendants. In their reply letter of October 15, 2004, defendants clarified that "Bukhara Grill II" had actually been sold, and then renamed by its new owners. But not only is this letter outside the record on summary judgment, but as defendants noted in their reply letter, the changed ownership and name of "Bukhara Grill II" is irrelevant to ITC's complaint, which makes no claims concerning the name "Khyber."

would assume ITC's rights in the "Bukhara" mark had been abandoned if no response was received by a date certain. (Marsh Decl. Exs. 25–26.) Neither ITC nor its counsel responded. Almost two years later, in April 2002, ITC's counsel again wrote to defendants' counsel complaining that no formal response had ever been received to their first cease and desist letter, and that defendants continued to violate ITC's property rights, particularly as "Bukhara Grill II" had opened by this point. (Marsh Decl. Ex. 27.) Defendant's counsel responded within days, restating their position that ITC had abandoned the "Bukhara" mark. (Marsh Decl. Ex. 28.)

No further communication was received from ITC or its counsel until the complaint in the instant case was filed on February 26, 2003. Defendants moved to dismiss the complaint, but their motion was denied. *See* Order of June 9, 2003. Having survived defendants' motion to dismiss, ITC amended its complaint on April 9, 2004. The Amended Complaint stated five causes of action in somewhat conclusory terms, three under the Lanham Act, 15 U.S.C. § 1051 et seq. (infringement of registered trademark, false designation of origin, unfair competition), one under New York General Business Law § 349 (deceptive acts and practices), and one under New York common law (trademark infringement and unfair competition). But in opposing defendants' present motion for summary judgment, ITC has clarified its complaint as claiming only trademark and trade dress infringement, unfair competition, and false advertising claims. (P. Opp.Mem.1—2.) Defendants asserted a number of counterclaims in their Amended Answer of April 26, 2004, including a claim for cancellation of ITC's trademark registration for the "Bukhara" mark. (Counterclaim II, Am. Answer ¶¶ 16–36.)

Defendants now move for summary judgment to dismiss the complaint against them and to cancel ITC's trademark registration for the "Bukhara" mark. Defendants also move to exclude the testimony of ITC's expert witness, William J. Guilfoyle.

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine issue as to any material fact," in turn, is established "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where a "genuine issue of material fact" exists, the motion will be defeated with respect to those claims that present such genuine issues. In determining the existence of a "genuine issue," this Court must view the evidence in the light most favorable to the nonmoving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion.").

As set forth in their moving papers, defendants construed ITC's complaint as asserting claims sounding almost exclusively in trademark and trade dress infringement. It now moves for summary judgment dismissing these claims on the sole ground of ITC's alleged abandonment of its rights in the "Bukhara" mark and dress.[4] In its opposition papers, ITC, while asserting that it has not abandoned

---

4. Defendants also moved to dismiss what it characterized as ITC's claim of misappropria-

its rights in the "Bukhara" mark or dress, also claims that it has brought two additional causes of action independent of its ownership or use of the "Bukhara" mark and dress in the United States—unfair competition under section 43(a) of the Lanham Act and New York common law and false advertising under the Lanham Act— which were not addressed by defendants in their moving papers. (P. Opp.Mem.1–2.) Consequently, defendants addressed these additional causes of action in their reply brief, but as their arguments for summary judgment were made there for the first time, ITC has not responded directly.

Nonetheless, defendants' motion for summary judgment on these additional claims is properly before the Court. First, defendants have moved for summary judgment dismissing the complaint in its entirety, and so the issues are technically before the Court. Second, given the sparsity of ITC's complaint, and the complaint's overt references to this being a trademark and trade dress case, it was reasonable for defendants not to have fully identified the unfair competition and false advertising theories now espoused in ITC's opposition papers. Finally, ITC has not sought permission to file a sur-reply, thereby signaling that it believes the issues were adequately briefed in their opposition papers, and that no new or unexpected matters were raised in the reply. Therefore, the Court will proceed to consider whether any of ITC's causes of action present genuine issues of material fact for trial.

## II. ITC's Abandonment of the "Bukhara" Mark and Dress

Defendants move for summary judgment dismissing ITC's trademark and dress infringement claims on the sole ground of abandonment.[5] Abandonment, which provides a complete defense to a claim of infringement, returns the mark to the public domain, where it may be appropriated anew. *Dial–A–Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F.Supp. 1339, 1354 (E.D.N.Y.1994) (citing *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 627 F.2d 628, 630 (2d Cir. 1980)). A mark is considered abandoned where (1) "use has been discontinued" and (2) there is "no intent to resume [use] within the reasonably foreseeable future." *Silverman v. CBS Inc.*, 870 F.2d 40, 46 (2d Cir.1989). The abandonment test applies equally to trademark and trade dress. See *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 935 (7th Cir.1989). "Intent to resume use" must be for use in the United States. *Imperial Tobacco, Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1579 (Fed.Cir. 1990).[6]

tion of trade secret recipes (D.Mem.1–2), but in their opposition papers, ITC disavowed any such claim. (P. Opp. Mem. 1 n. 1.)

5. While ITC obtained registration for its "Bukhara" mark, it has not registered the "Bukhara" trade dress. Unregistered trade dress may still be protected from infringement under section 43(a) of the Lanham Act where the trade dress has obtained "secondary meaning." *Wal–Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 216, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). Perhaps because defendants move for summary judgment only on the basis of abandonment, no party has addressed whether ITC's unregistered trade dress has obtained "secondary meaning" such that it is protectable under section 43(a), although this issue has been briefed in connection with ITC's unfair competition claims, *see* Part II below. Solely for purposes of deciding the issue of abandonment, the Court assumes ITC's "Bukhara" trade dress is protectable.

6. The Fourth Circuit recently held, over dissent, that "use in commerce" may include exclusive use in foreign trade, if the foreign mark owner also uses or displays the mark in the sale or advertising of services in the United States. The court relied on Lanham Act language defining a mark to be in "use in commerce" where "it is used or displayed in the sale or advertising of services *and* the

Under the Lanham Act, non-use for three consecutive years establishes a prima facie case of abandonment. 15 U.S.C. § 1127. Although the ultimate burden of proof as to abandonment remains with the party asserting this defense, where non-use gives rise to the statutory presumption of abandonment, the trademark owner must come forward with evidence that the "circumstances do not justify the inference of an intent not to resume use." *Emmpresa Cubana del Tabaco v. Culbro Corp.*, 213 F.Supp.2d 247, 268 (S.D.N.Y.2002) (citing *Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 99 (5th Cir.1983)).

Here, ITC does not seriously dispute that the statutory presumption of abandonment has been met; it has not owned, operated, or licensed restaurants in the United States using the "Bukhara" trademark or trade dress since at least August 28, 1997, five-and-a-half years before ITC filed its Complaint on February 26, 2003. (P.R. 56.1 Stmt. ¶ 29.) The statutory presumption had arisen as of August 28, 2000. But ITC does contend that it has demonstrated a genuine issue of material fact as to its intent to resume use, sufficient to rebut the statutory presumption at trial and precluding summary judgment. (P. Opp.Mem.4–11.)

██ A party's intent is ordinarily a question of fact, about which conflicting inferences can usually be drawn. Defendants thus bear a heavy burden in arguing here that no reasonable fact finder could conclude that ITC retained an intention to make use of the "Bukhara" trademark and trade dress in the United States. Nonetheless, the ordinary summary judgment standard applies, and "an averment of no intent to abandon is little more than a denial in a pleading, which is patently insufficient to preclude summary judgment on the ground the facts are disputed." *Imperial Tobacco Ltd., Assignee of Imperial Group PLC v. Philip Morris, Inc.*, 899 F.2d 1575, 1580 (Fed.Cir.1990). Once the statutory presumption of abandonment has been raised, a genuine issue of material fact with regard to intent to resume use will only be found where the trademark owner has "come forward with objective, hard evidence of actual concrete plans to resume use in the reasonably foreseeable future when the conditions requiring suspension abate. A bare assertion of possible future use is not enough to prove an intent to resume use." *Emmpresa Cubana*, 213 F.Supp.2d at 268–69 (internal quotation marks and citations omitted); *see also Imperial Tobacco*, 899 F.2d at 1580 ("The registrant must put forth evidence with respect to what activities it engaged in during the nonuse period or what outside events occurred from which an intent to resume use during the nonuse period may be reasonably inferred."). In spite of the voluminous record produced by ITC (including 163 exhibits), it has failed to come forward with any evidence of the kind of "concrete plans to resume use" or

services are rendered in commerce," (emphasis added) and "commerce" to be "all commerce which may be lawfully regulated by Congress," 15 U.S.C. § 1127, which it determined includes trade with U.S. consumers abroad by definition. *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 329 F.3d 359, 373 (4th Cir.2003). Assuming, without deciding, the viability of this theory in the Second Circuit, ITC might have argued that its continuous use of the mark abroad, coupled with advertising directed at U.S. consumers intended to induce patronage of their foreign franchise, defeats abandonment. ITC, however, did not press this argument, and it appears that it would have been unable to do so given the admission of its Executive Director, S.C. Sekhar, that ITC directs no advertising of its hotels or restaurants to the United States. (Sekhar Dep., Koustenis Decl. Ex. 3, at 342). Therefore, abandonment must be defeated, if at all, by use of the mark in the United States, a point uncontested by ITC in its briefing.

"activities it engaged in during the nonuse period ... from which an intent to resume use ... may be reasonably inferred" that would be required to rebut the statutory presumption of abandonment at trial.

■ ITC's evidence may be grouped into two categories. First, ITC has produced internal documents (and one news report) purportedly showing a commitment by ITC to increase the international recognition of the "Bukhara" mark. These internal memoranda show that periodic reorganizations took place within ITC for the purpose of heightening and renewing efforts to expand the "Bukhara" brand internationally. (Koustenis Decl. Exs. 27, 40, 41.) The last of these reorganizations, however, occurred in 1998, tolling the statutory presumption until 2001 at the latest. In any event, these reorganizations do not appear to have been directed in any specific manner toward expansion in the United States. Similarly, a July 22, 2002, news report in the *Times of India* cited by ITC describes ITC's plans to "cash in on its popular Bukhara and Dum Pukht restaurants," but makes no mention of specific investment opportunities or plans in the United States. (Swati Bharadwaj–Chand, *ITC Plans Restaurant Chain,* Times of India, July 22, 2002, Koustenis Decl. Ex. 28.) Moreover, minutes from a Corporate Management Committee ("CMC") meeting in February, 2003, show that a policy of "exiting all overseas stand alone Restaurants" was recommended. (Koustenis Decl. Ex. 34.) [7]

In the same vein, ITC also points to internal minutes dated October, 2003 (some six months after the Complaint in this case was filed), at which the CMC suggested the "time was appropriate to explore the possibility of investing in hotel properties in select markets overseas such as London, Bangkok, and New York."

(Koustenis Decl. Ex. 29.) But even assuming that self-serving statements after the filing of litigation can be considered, a plan to "invest[ ] in hotel properties" is not itself evidence of intent to resume use of the "Bukhara" mark for restaurant services. It is unknowable and entirely speculative whether the projected hotel properties might have included a "Bukhara" restaurant. ITC has provided no evidence that such opportunities were ever genuinely explored in the United States. The assertion in ITC's brief that, following the meeting of the CMC in October, 2003, "ITC expressed its intent to start looking for opportunities to invest directly in New York" (P. Opp.Mem.6), is supported, if at all, only by Sekhar's averment that ITC is "enthusiastic about the possibility of returning their Bukhara franchise to the United States and are exploring opportunities for such expansion around the globe with, amongst others, its partner Starwood Hotels." (Sekhar Aff. ¶ 14.) This will not suffice to raise a genuine issue of material fact as to ITC's intent to resume use of the "Bukhara" mark and dress.

Second, ITC attempts to establish that concrete franchise opportunities in the United States have been pursued by providing the Court with standard franchise agreements "representative of agreements that ITC has been implementing for years with franchisees throughout the world" and by including correspondence with potential franchisees over the years. (P. Opp. Mem. 6–7; Koustenis Decl. Exs. 31–33, 35–36, 38–39). The executed franchise agreements provided, however, are for franchises in Bangladesh, Bahrain, and the United Arab Emirates (Koustenis Decl. Exs. 36, 38, 39), and none of the potential franchisees to whom information, including "concept note[s]" and "salient features of franchise agreement[s]" was provided to

---

7. As discussed below, ITC's actions have been entirely consistent with this policy.

initiate negotiations were located in the United States. (Koustenis Decl. Exs. 31–33, 35). Although communication with one potential franchisee, located in Canada, referenced possible development in the United States (Koustenis Decl. Ex. 35), this communication took place in 1993, long before ITC ceased using the mark in the United States, and thus cannot serve to rebut the inference of abandonment.

ITC claims to have entered franchise negotiations for "Bukhara" restaurants with five parties in the United States since the 1997 closure of their Chicago restaurant (P. Opp.Mem.7), but, as a careful exploration of the evidence adduced in connection with each of these putative negotiations reveals, ITC has provided no real evidence of its own efforts, and thus, intent, to resume restaurant services. In the first case, ITC proffers only an unsolicited email in 2002 from a software engineer interested in developing a "Bukhara" franchise in Houston, Texas. (Koustenis Ex. 24.) S.C. Sekhar, an ITC Executive Director with responsibility for expansion of the "Bukhara" brand, never responded to the email, but did meet with the software engineer in New Delhi, where he explained that ITC was *not* interested in proposals for stand-alone restaurants. (Sekhar Dep., Koustenis Decl. Ex. 3, at 285–86.)

In another two cases, ITC offers only follow-up emails or letters sent by two separate, potential franchisees following unsolicited meetings in New Delhi with Sekhar or his colleague, Ravi Suri. In the first, the potential franchisee informs Sekhar of his plans to contact the managers of local hotels in California about establishing a "Bukhara" restaurant. (Koustenis Ex. 25.) But Sekhar testified that a proposal never materialized from this potential franchisee, and he took no steps to pursue one. (Sekhar Dep. 294–97.) In the second, the potential franchisee describes his plans to visit San Francisco to "study the market and shortlist two or three sites." (Koustenis Ex. 23.) Sekhar, however, had never heard of the potential franchisee (Sekhar Dep. 297), and testified that at the time the potential franchisee had been in contact with ITC, his proposal would have been of little interest, given ITC's move away from overseas stand-alone restaurants. (Sekhar Dep. 300–301.)

In a fourth purported "franchise negotiation," ITC contends that negotiations matured into the purchase of property in New York and the submission of floor plans for ITC's approval. (P. Opp.Mem.7.) But documents provided by ITC do not substantiate this assertion, consisting of no more than a floor plan and cover letter addressed to Ravi Suri from Varinder Datta, at the time, an employee of an ITC subsidiary (Sekhar Dep. 280), indicating that the floor plan was "for the proposed location which [the potential franchisee, A. Dutta] has negotiated for acquisition, subject to your approval." (Koustenis Decl. Exs. 21–22.) There is no evidence that approval was granted, and in fact, Sekhar did not recall ever having heard of Dutta or his proposal prior to preparing for his deposition. (Sekhar Dep. 269–281.) Most importantly, even assuming bona fide negotiations took place (rather than simply an unsolicited, unanswered proposal), they date to 1998, again well outside the three-year period predating the original complaint in this matter and giving rise to a statutory presumption of non-use.

Finally, ITC claims there are ongoing negotiations with Starwood Hotels, which owns luxury hotel properties throughout the world, including thirteen in New York City. (P. Opp. Mem. 7; Sekhar Aff. ¶ 20.) ITC has previously partnered with Starwood to open "Bukhara" restaurants in Bangkok and Hong Kong, and points to a 2002 letter from Starwood, which followed

a visit by a senior Starwood executive to New Delhi to discuss possible placement of "Bukhara" restaurants in additional Starwood properties. (Sekhar Aff. ¶ 18; Koustenis Decl. Ex. 26). But that letter, only a highly-redacted version of which has been provided, makes no reference to development plans specific to the United States, indicating only a general intention to "explore opportunities where Bukhara restaurants could be operated in Starwood hotels outside India." (Koustenis Decl. Ex. 26, at 4.) Sekhar's testimony about ITC's negotiations with Starwood also asserts no plans for expansion to the United States, rather than merely "outside India." (Sekhar Dep. 77 (no specific plans for starting a hotel or restaurant with Starwood in the United States).) Therefore, while there appears to have been some back-and-forth between ITC and Starwood as to expanded use of the "Bukhara" mark, nothing on the record, viewed in the light most favorable to ITC, permits an inference that these discussions involved use in the United States.

These putative negotiations, no more than a handful in the seven years since 1997, amount to little more than a series of unsolicited proposals, which ITC neither initiated nor pursued, and, in the case of Starwood, vague, unsubstantiated plans for resuming use in unspecified non-Indian locations. While ITC is free to pick and choose among proposals received for use of its mark according to its own business judgment, and executed franchise agreements are not necessary to show intent to resume use, ITC has provided no evidence

whatever of any actions on its part during the relevant time frame to develop restaurant services utilizing the "Bukhara" mark in the United States.[8]

To explain the absence of any real activity to resume use of the mark in the United States, ITC asserts that it is simply waiting for the "right partner" to come along. (Sekhar Dep. 78.) For the abandonment doctrine to have any teeth at all, however, more is required than simply the owner's inchoate wish to keep the mark for some vague, unspecified future use; this would constitute precisely the impermissible "warehousing" of the mark against which the doctrine guards. *See Emmpresa Cubana*, 213 F.Supp.2d at 270. On this record, while reasonable people could differ about whether ITC had a purely subjective desire to retain rights to the "Bukhara" mark in the United States and an inchoate willingness to consider using it again here if the right opportunity came along, no reasonable fact finder could conclude that ITC had taken any action—or even conceived any concrete plan—evidencing an intent to resume use in the reasonably foreseeable future. The statutory presumption of abandonment accordingly stands unrebutted.

ITC's remaining arguments do nothing to disturb this conclusion. ITC claims that it has maintained the goodwill of the "Bukhara" mark in the United States through continued marketing efforts in the United States, consisting primarily of use of the "Bukhara" mark to promote a line of packaged goods, including one product named

---

**8.** Nor has ITC apparently taken any action against other restaurants in the United States using the name "Bukhara," of which there appear to be several. (Marsh Reply Decl. Ex. 32 (results of internet search showing "Bukhara" restaurants, unaffiliated with ITC, in New York, Massachusetts, Washington, and Virginia).). While the record has not been sufficiently developed to permit a con-

clusion that failure to police use of the "Bukhara" mark itself constitutes a species of abandonment, *see* 15 U.S.C. § 1127 (alternative definition of abandonment includes acts of omission by owner causing mark to lose significance), the failure to act against these other users of the same name is inconsistent with a serious plan to return to the restaurant services market in the United States.

"Dal Bukhara" and marketed as identical to the signature lentil dish of that name served at their "Bukhara" restaurants. (P. Opp.Mem.7–8.)[9] In 2000, the CMC agreed to begin marketing of what it then called "Bukhara Dal" (Koustenis Decl. Ex. 99), and in 2001, partnered with King Maker Marketing, ITC's U.S. importer, to market test packaged foods in the United States. (Parameswar Dep., Koustenis Decl. Ex. 92, at 5, 18.) "Dal Bukhara" made appearances at the International Fancy Foods Festival in New York in 2003 and 2004 (Parameswar Dep. 26; Sekhar Aff. ¶ 23), and at least two shipments of "Dal Bukhara" were sold in the United States in May 2003 (Sekhar Aff. ¶ 22). ITC has also applied for trademark registrations for the "Bukhara" mark in connection with pre-packaged food items (Marsh Decl. Ex. 6), and Sekhar avers that "discussions for marketing its packaged food products including Bukhara products in [the] USA are in advanced stage of discussions with a leading distributor of food products in [the] USA." (Sekhar Aff. ¶ 24.)

Although promotional materials distributed for "Dal Bukhara" in connection with its trade show appearances reference ITC's New Delhi "Bukhara" restaurant (Koustenis Decl. Ex. 101), appearance at two trade shows, sale of two shipments of the product in the United States, and an unsubstantiated, yet-to-be concluded distribution agreement postdating the commencement of litigation are nothing more than "minor activities" insufficient to "rekindle the public's identification of the mark with the proprietor" several years after the cessation of restaurant services in the United States. *See Silverman,* 870 F.2d at 48. Aside from conclusory assertions in its briefing (P. Opp.Mem.8), ITC has provided nothing to suggest that the sale of packaged foods under the "Bukhara" mark was somehow intended to herald a return to the restaurant services market in United States. Therefore, ITC's use of the mark in connection with its packaged foods establishes neither continued goodwill of the mark in the United States, nor ITC's intent to resume use of its "Bukhara" mark or dress for restaurant services.

▮ Finally, ITC attempts to explain away its apparent abandonment of the mark for restaurant services by asserting that its non-use may be excused because of "economic and regulatory circumstances." (P. Opp.Mem.9–10.) As a matter of law, ITC is correct that external barriers to use of a mark may excuse non-use, such that abandonment is not established. *See Silverman,* 870 F.2d at 47 ("A proprietor who temporarily suspends use of a mark can rebut the presumption of abandonment by showing reasonable grounds for the suspension and plans to resume use in the reasonably foreseeable future when conditions requiring suspension abate.").

9. In connection with ITC's argument that it has maintained the goodwill of the "Bukhara" mark and dress through marketing, ITC also cites to a July, 2002, Indian Air advertisement for the New Delhi "Bukhara" (Koustenis Decl. Ex. 65); an exhibit identified only as "Clinton Advertisement," which excerpts Bill Clinton's statement to the *New York Times* that "[He] loved the Bukhara meal [he] had in Delhi." (Koustenis Decl. Ex. 83); and a brochure advertising its hotels in India, including the Maurya Sheraton and its "Bukhara" restaurant, distributed to ITC–Welcomgroup's Star–Privilege Members, unaccompanied by information as to its circulation (Koustenis Decl. Ex. 84). These do not permit the inference that a sustained marketing campaign targeted at American consumers, sufficient to maintain the goodwill of the "Bukhara" mark and dress several years after the cessation of restaurant services in this country, exists, particularly in light of Sekhar's testimony that while it is possible for advertisements to find their way to U.S. consumers, ITC does not target advertising for its hotels or restaurants to the United States. (Sekhar Dep. 342–43.)

But ITC's asserted "economic and regulatory circumstances" are largely illusory. First, ITC argues that Indian regulations governing foreign investment have created a barrier to its direct investment in the United States. (P. Opp.Mem.10.) But at least some of these regulations predate ITC's establishment of its restaurants in Chicago and New York (Sekhar Aff. Ex. A (excerpting Foreign Exchange Regulation Act, 1973, as amended most recently in 1996)), and more recent regulations (Sekhar Aff. Ex. A (excerpting Foreign Exchange Management Act, effective June 1, 2000)) have apparently not prevented development of their packaged food products. ITC cites no internal documents indicating that these regulations accounted for its unresponsiveness to potential franchisees, the closing of the Chicago and New York restaurants, or the lack of restaurant initiatives in the United States, nor does it explain why the regulations did not impede activity in other countries. Second, ITC blames terrorism, war, and the SARS epidemic during 2001–2003 for their non-use (P. Opp. Mem. 10; Sekhar Aff. ¶¶ 12–13). But the statutory presumption of abandonment had arisen by August 2000—three years after ITC terminated the license agreement with the restaurant in Chicago—well before these events, which therefore cannot constitute an excuse for non-use which would "toll" the statutory presumption.

Regardless, excusable non-use requires more than just reasonable business explanations for the decision not to use a trademark; the trademark owner must also demonstrate an intent to resume use if and when conditions so permit. *Emmpresa*

*Cubana*, 213 F.Supp.2d at 270 & n. 37 (citing *Silverman*, 870 F.2d at 47). ITC has not proffered any evidence of an intent to resume use directly connected to the cessation of the "economic and regulatory circumstances" it cites, or any evidence of concrete plans to expand in the United States, thwarted only by the regulatory or business obstacles on which it relies.[10] Whatever the merits of the explanations proffered by ITC, they cannot excuse non-use in the absence of any intent to resume use.

ITC has failed to come forward with evidence creating a genuine issue of material fact as to its intent to resume use of the "Bukhara" mark and dress in connection with restaurant services in the United States, and therefore would not be able to defeat at trial the statutory presumption raised under § 1127 by non-use for a period exceeding three years. Therefore, as a matter of law, ITC has abandoned the "Bukhara" mark and dress and may not maintain infringement claims against defendants. Summary judgment dismissing plaintiffs' trademark and trade dress infringement claims and cancelling ITC's "Bukhara" registration is granted.[11]

### III. *ITC's Unfair Competition Claims*

█ In opposing summary judgment, ITC asserts that its unfair competition claims under section 43(a) of the Lanham Act and the New York common law provide a basis for liability independent of trademark law. Even if it abandoned the "Bukhara" mark and dress within the United States, ITC claims it is nonetheless protected from unfair competition by virtue of the "well known" or "famous" marks

---

**10.** Sekhar's bare assertion that the "improvement in the industry … makes it possible to consider acquiring or developing [ITC's] own properties outside India" (Sekhar Aff. ¶ 14) is insufficient to raise a triable issue.

**11.** Where a federally registered mark is already in issue, a federal court may cancel the registration under section 37 of the Lanham Act. 15 U.S.C. § 1119. Abandonment is a grounds for cancellation. 15 U.S.C. § 1064(3).

doctrine. (P. Opp.Mem.11.) According to ITC, despite the territorial limits ordinarily applicable in trademark law, *see Person's Co. v. Christman,* 900 F.2d 1565, 1568 (Fed.Cir.1990) ("[F]oreign use has no effect on U.S. commerce and cannot form the basis for a holding that appellant has priority here."), foreign marks and trade dress may be protected, even without use or registration within the United States, where the mark or dress is so "well known" or "famous" as to give rise to a risk of consumer confusion if the mark or dress is used subsequently by someone else in the domestic marketplace.

The very existence of this doctrine is controversial, as is its scope. Neither party cites, nor has the Court found, any Supreme Court or Second Circuit authority upholding liability on this theory, and it has been applied infrequently by the federal district courts. The doctrine has only recently been applied for the first time by any federal court of appeals. In *Grupo Gigante S.A. de C.V. v. Dallo & Co.,* 391 F.3d 1088 (9th Cir.2004), the Ninth Circuit held that a Mexican grocery store chain could be permitted to establish whether its mark, "Gigante," was sufficiently "well known" or "famous" in the relevant American market such that the mark was entitled to protection from use by a California chain, thus potentially permitting prior, exclusively foreign use to trump domestic, junior use and entitling the foreign, senior user to certain rights with the United States. The circumstances of *Grupo Gigante* were arguably different from those in this case, as can be discerned from the statement of the Court's reasoning: "Commerce crosses borders. In this nation of immigrants so do people. Trademark is, at its core, about protecting against consumer confusion and 'palming off.' There can be no justification for using trademark law to fool immigrants into thinking that they are buying from the store they liked back home." *Id.* at 1094.

Two early cases in New York state courts, with fact patterns strikingly similar to the events alleged here by ITC, exemplify the doctrine. In *Maison Prunier v. Prunier's Restaurant & Cafe, Inc.,* 159 Misc. 551, 288 N.Y.S. 529, 537 (N.Y.Sup.Ct. 1936), plaintiff, owner of three "Prunier" restaurants in Paris and London, was permitted to demonstrate at trial that "its reputation extends far beyond the territorial limits of Paris and London and that it has a substantial following in New York City and in other parts of the world" such that defendants could be enjoined from using its name and dress, allegedly to create a false affiliation between plaintiff's ventures and its own. In the most famous alleged instance of the "well known" or "famous" mark doctrine, *Vaudable v. Montmartre, Inc.,* 20 Misc.2d 757, 193 N.Y.S.2d 332, 334—35 (N.Y.Sup.Ct.1959), a New York restaurateur allegedly sought to create a false affiliation between its venture and that of the Paris "Maxim" restaurant by copying its decor and logo. The court found that "there [was] no doubt as to [Maxim's] unique and eminent position as a restaurant of international fame and prestige. It is ... well known in this country, particularly to the class of people residing in the cosmopolitan city of New York who dine out. Plaintiffs have registered the mark Maxim's with the United States Patent Office for catering services and wines, and have merchandised and sold products under that name, or a variant thereof, in the United States." *Vaudable,* 193 N.Y.S.2d at 334. The court went on to characterize "Maxim" as having acquired "secondary meaning," *id.,* 193 N.Y.S.2d at 335, a trademark law term of art connoting the mark's ability to "identify the source of the product rather than the product itself" in the mind of the consumer. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 766 n. 4, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (quoting *Inwood*

*Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 & n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). It was this "secondary meaning" within the "high-class restaurant field" which entitled "Maxim" to protection from unfair competition. *Vaudable,* 193 N.Y.S.2d at 335. While *Prunier* predates the Lanham Act, *Vaudable* references both the federal and common law of unfair competition.

Assuming without deciding that these cases support the existence of an unfair competition claim, even in the absence of a viable U.S. trademark, on the basis of a foreign mark that is "well known" or "famous," it remains unclear how to determine what foreign marks are sufficiently "famous" to qualify. Both parties urge the use of the "secondary meaning" test, derived at least in part from *Vaudable,* citing the district court opinion in *Grupo Gigante S.A. de C.V. v. Dallo & Co., Inc.*, 119 F.Supp.2d 1083, 1091 (C.D.Cal.2000). (D. Reply Mem. 7; P. Opp. Mem. 12.) That test has also been endorsed by a district court in this Circuit, *see Empresa Cubana del Tabaca v. Culbro Corp.*, No. 97 Civ. 8399(RWS), 2004 WL 602295, at *31–*34 (S.D.N.Y. Mar.26, 2004) (finding after bench trial that mark of Cuban cigar maker had achieved "secondary meaning" with premium cigar smokers and thus qualified for "famous" mark doctrine), and the Trademark Trial and Appeal Boards has similarly relied on the *Vaudable* standard. *See, e.g., The All England Lawn Tennis Club (Wimbledon) Ltd. v. Creations Aromatiques, Inc.*, 220 U.S.P.Q. 1069, 1072, 1983 WL 51903 (T.T.A.B.1983).[12]

The Ninth Circuit, however in *its* opinion in *Grupo Gigante* (which postdates the briefing on this motion), required more. While confirming the existence of the "well known" or "famous" mark doctrine, the court concluded that applying "secondary meaning" as the test of notoriety without more eviscerates an important distinction between a geographically remote, but domestic user, protected by the *Tea Rose–Rectanus* doctrine, and a ordinarily unpro-

---

12. The opinion in *Vaudable* has been interpreted as establishing "secondary meaning" as the basis for extending protection to the foreign mark, *see, e.g., Empresa Cubana,* 2004 WL 602295, at *32–*34, but it has also been more loosely used without explicit reference to "secondary meaning," *see, e.g., Wimbledon,* 220 U.S.P.Q. at 1072. Still other courts, however, have found a slightly different path to "secondary meaning." In its opinion in *Grupo Gigante,* the district court took its cue from the *Tea Rose–Rectanus* doctrine (to which the *Prunier* court had also looked, 288 N.Y.S. at 536–37, and to which a leading treatise on trademark law makes reference to in connection with the "well known" or "famous" mark doctrine, 4 *McCarthy* § 29:4, at 29–10). The *Tea Rose–Rectanus* doctrine, derived from two, early Supreme Court cases, *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916), and *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918), delimits the geographic reach of a senior user's trademark: A senior user in one market cannot preclude a junior, good faith use of the mark in a geographically remote (but still domestic) area if the senior user's mark is not known to consumers in the junior user's market. *Grupo Gigante,* 119 F.Supp.2d at 1090. Effectively internationalizing the *Tea Rose–Rectanus* doctrine, the *Grupo Gigante* district court held that "the foreign user need only show that the mark is sufficiently known to potential customers in the area of the United States in which it seeks protection" to be accorded protection, where "sufficiently known," in turn, was defined as the mark having achieved "secondary meaning." *Id.* at 1090–91. The *Empresa Cubana* district court also considered the *Tea Rose–Rectanus* doctrine and the district court opinion in *Grupo Gigante,* and found that the "secondary meaning" element of the *Tea Rose–Rectanus* doctrine coincided with the *Vaudable* standard, but rejected *Tea Rose–Rectanus's* geographical limits as inapplicable to the facts of its case, where potential consumers (premium cigar smokers) were spread throughout the United States. *Empresa Cubana,* 2004 WL 602295, at *34.

tected foreign user. *Gigante Grupo*, 391 F.3d at 1094, 1097–98. The Ninth Circuit stated the test as follows:

> [W]here the mark has not before been used in the American market, the court must be satisfied, by a preponderance of the evidence, that a *substantial* percentage of consumers in the relevant American market is familiar with the foreign mark. The relevant American market is the geographic area where the defendant uses the alleged infringing mark. In making this determination, the court should consider such factors as the intentional copying of the mark by the defendant, and whether customers of the American firm are likely to think they are patronizing the same firm that uses the mark in another country. While these factors are not necessarily determinative, they are particularly relevant because they bear heavily on the risks of consumer confusion and fraud, which are the reasons for having a famous-mark exception.

391 F.3d at 1098. The Ninth Circuit then remanded for application of this newly-articulated "secondary meaning plus" test.

By requiring more of foreign users than would be required of domestic users seeking to extend the geographic range of their marks, the Ninth Circuit manages to neatly square the circle of what has often been considered a somewhat anomalous, and perhaps even unnecessary, doctrine.[13] But the Ninth Circuit's decision in *Grupo Gigante* leaves undisturbed the apparent consensus that, at the very least, and whether derived from *Vaudable* or by analogy to *Tea Rose–Rectanus*, "secondary meaning" must be established in the relevant American market for a mark to qualify under the "well known" or "famous" mark doctrine. Because ITC has failed even to establish a triable issue as to the existence of "secondary meaning" in the New York market in which defendants operate, it is unnecessary to decide whether to adopt the Ninth Circuit's analysis requiring an additional showing over and above "secondary meaning."

The following factors are relevant to determination of "secondary meaning" in this Circuit: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir.1997) (quoting *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1222 (2d Cir.1987)).

ITC has failed to produce sufficient evidence of a genuine issue of material fact as to the existence of "secondary meaning." Setting aside advertisement campaigns conducted by its New York and Chicago restaurants,[14] it has not directly

---

**13.** *See, e.g., Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 329 F.3d 359, 389 n. 9 (4th Cir.2003) (Motz, J., dissenting) ("Nor does the 'famous marks' doctrine provide [defendant] any refuge. That doctrine has been applied so seldom (never by a federal appellate court and only by a handful of district courts) that its viability is uncertain."); 4 *McCarthy* § 29 ("The famous mark rule [in *Vaudable* ] could be viewed as not constituting an exception to the general rule at all, since it could be said that the foreign service business has already established priority in the United States through advertising and reputation prior to defendant's opening.").

**14.** Evidence as to any "secondary meaning" established through operation of their Chicago and New York restaurants is not relevant to the present inquiry. Having abandoned its mark and dress in the United States, ITC's only cognizable claim to priority, and the only unfair competition claim actually made by ITC, derives from its foreign use under the "well known" or "famous" mark doctrine.

targeted advertising of its Indian or other foreign "Bukhara" restaurants to the United States (Sekhar Dep. 342), and has made only two trade show appearances in connection with "Dal Bukhara." (Parameswar Dep. 26; Sekhar Aff. ¶ 23.) Although ITC cites to a July, 2002, Indian Air advertisement for the New Delhi "Bukhara" (Koustenis Decl. Ex. 65), an exhibit identified only as "Clinton Advertisement," which excerpts Bill Clinton's statement to the *New York Times* that "[He] loved the Bukhara meal [he] had in Delhi." (Koustenis Decl. Ex. 83), and a brochure distributed to ITC–Welcomgroup's Star–Privilege Members advertising its hotels in India, including the Maurya Sheraton and its "Bukhara" restaurant (Koustenis Decl. Ex. 84), in support of its argument that it has maintained the goodwill of the "Bukhara" mark in the United States, see Part II above, surprisingly, it does not cite to these exhibits here. In any event, these exhibits are unaccompanied by any evidence of their circulation in the New York market, and, thus, are not probative.

ITC has not produced a consumer study linking the "Bukhara" mark to itself.[15] Although the record does include an exhibit consisting of fourteen comment cards filled out by famous patrons of its New Delhi restaurant, including Americans such as Bill Clinton and Bill Gates (Koustenis Decl. Ex. 89), such evidence is not probative of knowledge of ITC's mark among New York restaurant-goers, or indicative

that even these diners, who undoubtedly had a favorable experience at ITC's restaurant, generally associate the "Bukhara" mark, as used in the United States, with ITC. Although ITC has continuously used the "Bukhara" mark since at least the 1977 opening of the New Delhi "Bukhara," it cannot claim exclusive use, because defendants have demonstrated that there are other "Bukhara" restaurants unaffiliated with ITC throughout the United States and the world (Marsh Reply Decl. Exs. 32–34), and ITC has not offered any specific information as to the success of sales of two shipments of its canned "Dal Bukhara" in May 2003 (neither one to New York) and currently has no other revenues from business operations in the United States utilizing the "Bukhara" mark. Thus, ITC has offered essentially no probative evidence as to factors (1), (2), (4), and (6).

This leaves only two factors through which ITC can establish "secondary meaning": unsolicited media reports and defendants' alleged appropriation of ITC's mark and dress. ITC rounds up nineteen exhibits of what it claims are media reports praising its "Bukhara" restaurants. (P. Opp.Mem.13.) One exhibit is actually the collection of customer comment cards referenced above, four exhibits are media reports about or awards received by ITC's New York and Chicago restaurants (Koustenis Decl. Exs. 68, 78, 80–81), and the vast majority are reports in foreign publica-

Therefore any "secondary meaning" must be based exclusively on consumer familiarity with its international franchise.

15. ITC does not cite to the market testing conducted in connection with its line of packaged goods in support of its contention that "secondary meaning" exists. The Court's conclusion that no "secondary meaning" exists, however, is buttressed by the testimony of the King Maker Marketing director, vice president, and CFO partly responsible for

conducting that market testing. She stated that no research was done as to whether or not "Bukhara" was a strong brand name in the United States, and the conclusion that the "Bukhara" mark had a strong connection to the New Delhi restaurant was based solely on discussions with between twenty and fifty "informal acquaintances" who had "been to [the New Delhi] Bukhara or had knowledge of the Bukhara restaurant." (Parameswar Dep. 39–48.)

tions, reviews posted to what appear to be exclusively foreign websites (several of which are missing a uniform resource locator which make it difficult to ascertain their source with precision), and a book published in India in connection with an Indian television series. (Koustenis Decl. Exs. 59, 61–63, 65–67, 69–71, 88.) The latter reviews, reports, and book, while highly flattering to ITC's "Bukhara" restaurants (repeatedly referring to the New Delhi "Bukhara" as the most famous Indian restaurant in the world), are unaccompanied by evidence permitting the Court to infer that they ever reached a New York audience or that they reflect the knowledge of New York consumers. Only three cited exhibits are U.S. media reports, and two of these are reviews of defendants' restaurants, which mention ITC's New Delhi "Bukhara," in one as the namesake of defendants' restaurants, as well as defendants' training ground (Koustenis Decl. Ex. 64), and in the other, as defendants' training ground. (Koustenis Decl. Ex. 87.) ITC has produced only one media report from a U.S. source touting its New Delhi "Bukhara." (*Curry Without the Hurry,* Time, Dec. 23, 2003, Koustenis Decl. Ex. 60.) The accolades for ITC's "Bukhara" restaurants in the international press are not sufficiently probative of "secondary meaning" within the New York market to raise a triable issue.

Consequently, ITC is left only with its somewhat circular claim that defendants' alleged appropriation of the "Bukhara" mark and dress itself establishes the existence of "secondary meaning." Certainly, the record contains sufficient evidence to raise a genuine issue of fact as to whether defendants have intentionally copied ITC's "Bukhara" mark and dress. A reasonable factfinder could conclude that exhibits supplied by ITC show similarities between the parties' restaurants, including a similar logo font (Koustenis Decl. Exs. 103–104); waiter uniforms (Koustenis Decl. Exs. 144–145); menus on wood slabs, bearing the legend "eating utensils upon request" (Koustenis Decl. Exs. 125, 147–148); red, checkered bibs used in lieu of napkins (Koustenis Decl. Exs. 145–147); a see-through kitchen (Koustenis Decl. Exs. 130–131); and use of heavy wooden furniture and other rustic, decorative elements (Koustenis Decl. Exs. 97, 134–143). As a result of these similarities, as well as defendants' employment history with ITC, at least one reviewer of defendants' restaurants has noticed a resemblance to those of ITC. (J. Walmans Travel Restaurant Entertainment & Wine Report, 2002, Koustenis Decl. Ex. 64) ("The [menu's warning to request eating utensils] takes its roots from Bukhara Grill's namesake, Bukhara in New Delhi, long considered by aficionados of Indian cuisine as the finest Indian restaurant in the world.")[16] Moreover, defendant Raja Jhanji stated in an interview with the *Hindustan Times* that defendants' "Bukhara Grill" restaurant "is quite like Delhi's Bukhara.... The food is similar ... and the waiters too are dressed in similar Panthani suits," although he maintained the decor was distinct. (Shweta Rajpal, *Dal "Bukhara" in NY,* Hindustan Times, May 2, 2000, Koustenis Decl. Ex. 102.)

But "[p]roof of intentional copying, by itself, does not trigger any presumption of secondary meaning under Second Circuit precedent." *Kaufman & Fisher Wish Ltd. v. F.A.O. Schwarz,* 184 F.Supp.2d 311, 319 (S.D.N.Y.2001) (citing to *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1042 (2d Cir.1992) ("Although imitative intent can help support a finding of secondary meaning, it does not

---

**16.** Notably, the reviewer did not suggest that he or she was confused about the ownership of the "Bukhara Grill," or suggest that he or she inferred common ownership.

necessarily mandate one. No single factor is determinative.") (internal quotation marks and citations omitted)). Although there may be some circumstances in which intentional copying is sufficient to show "secondary meaning," it would be tautological to conclude that copying alone demonstrates "secondary meaning" sufficient to permit an unfair competition claim as to a foreign mark here, where that copying is only prohibited by the "well known" or "famous" mark exception if the mark has "secondary meaning." ITC has failed to bring forward any other evidence actually probative of "secondary meaning," and therefore cannot claim the "well known" or "famous" mark exception to revitalize its priority to the "Bukhara" mark and dress based on foreign use alone. Summary judgment dismissing ITC's unfair competition claims is therefore granted.

## IV. *ITC's False Advertising Claim*

■ Section 43(a) of the Lanham Act protects against false representations which are likely to deceive or mislead consumers about the nature of goods and services.[17] ITC alleges that defendants have violated this section by making false or misleading representations in various press interviews suggesting the existence of a relationship between their restaurants and those of ITC, where in actuality there is none, bolstered by the "confusingly similar use of ITC's Bukhara name and trade dress," which grounded its unfair competition claims. (P. Opp.Mem.17–21.) Defendants move for summary judgment on this

claim, citing section 43(a)'s standing requirement, and in the alternative, a lack of evidence as to any false or misleading representations on their part as to a relationship with ITC's "Bukhara" franchise, made in commercial advertising or otherwise. (D. Reply Mem. 9–10.)

As the text of the statute makes clear, "to establish standing under section 43(a), the plaintiff must demonstrate a reasonable interest to be protected," as well as a "reasonable basis for believing that this interest is likely to be damaged by the false or misleading advertising. The reasonable basis prong embodies a requirement that the plaintiff show both likely injury and a causal nexus to the false advertising." *Havana Club Holding S.A. v. Galleon S.A.*, 203 F.3d 116, 130 (2d Cir.2000) (citing *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir.1994)) (internal quotation marks omitted). Although this Circuit has been inclined to construe the standing requirement somewhat liberally, given the statute's additional purpose of consumer protection (as opposed to mere policing of competitive commercial relationships), where the plaintiff is not in direct competition, a "more substantial showing" of injury and causality has been required. *Ortho Pharm. Corp.*, 32 F.3d at 694 (summarizing caselaw).

While acknowledging the injury requirement of section 43(a), ITC asserts it has standing to bring this claim because its plans to open a new "Bukhara" restaurant

---

**17.** Section 43(a) provides in relevant part:
a) Civil action
(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation or origin, false or misleading description of fact, or false or misleading representation of fact, which—

. . .
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125.

in the United States and its sale of a line of pre-packaged food products using the "Bukhara" mark constitute "reasonable interest[s] to be protected." (P. Opp. Mem.18.) First, as decided above, ITC has abandoned the "Bukhara" mark and dress within the United States in connection with restaurant services, has provided no evidence of any intent to resume use in the reasonably foreseeable future, and is not entitled to any priority or protection on the basis of the "well known" or "famous" mark exception. Second, while sales of the "Dal Bukhara" line of pre-packaged food products are a "reasonable interest to be protected," ITC has failed to provide any causality theory, let alone evidence, as to how its "Dal Bukhara" product sales are likely to be or have been damaged by defendants' alleged misrepresentations. It stretches the limits of reason to suggest that consumers, confused as to a non-existent affiliation between ITC's canned "Dal Bukhara" and dishes served at defendants' restaurants, are likely to visit Manhattan to dine out at the "Bukhara Grill" restaurant, rather than purchasing the canned product at their local grocery store. Regardless, if this is indeed what ITC had in mind in pressing this claim, it has failed entirely to provide evidence of the likelihood of any such injury.

The evidence adduced in connection with sale of its "Dal Bukhara" product consists in the main of appearances at two trade shows, sales of two shipments to distributors in California and New Jersey in May 2003, and an averment that "discussions for marketing its packaged food products including Bukhara products in [the] USA are in advanced stage of discussions with a leading distributor of food products in [the] USA." (Sekhar Aff. ¶¶ 22–24.) These marketing and distribution efforts speak not at all to a potential overlap between consumers of the packaged "Dal Bukhara" and patrons of defendants' restaurants.

Therefore, even assuming defendants have made misrepresentations cognizable as false advertising, ITC has not demonstrated any potential or actual injury causally related to defendants' conduct giving rise to standing under section 43(a). Defendants' motion for summary judgment dismissing ITC's false advertising claim is granted.

## CONCLUSION

Summary judgment dismissing ITC's complaint in its entirety, and cancelling ITC's registration of the "Bukhara" mark (United States Trademark Registration No. 1,461,445) as pressed by defendants in Counterclaim II of their Amended Answer, is granted. Defendants' motion to exclude the expert testimony of William J. Guilfoyle is therefore moot.

SO ORDERED.